Filed 1/25/17

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE


| | |
|---|---|
| THE PEOPLE, | B261130 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA094966) |
| v. | |
| KEVIN ADONIS FORREST, | |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court of Los Angeles County.  James D. Otto, Judge.  Affirmed.

Carlo Andreani, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Victoria B. Wilson, Supervising Deputy Attorney General, and Chung L. Mar, Deputy Attorney General, for Plaintiff and Respondent.

———————————————

Kevin Forrest appeals from the judgment entered following a jury trial in which he was convicted of the first degree murder of his wife. (Pen. Code,[1] § 187, subd. (a).) The jury also found all firearm and deadly weapon allegations true. (§§ 12022.53, subd. (d), 12022, subd. (b)(1).) The court imposed an aggregate sentence of 50 years to life in state prison. Appellant contends that the prosecutor committed prejudicial misconduct by misstating the law regarding voluntary intoxication and heat of passion in closing argument. He further maintains that the trial court's incorrect instruction on the mental state required for voluntary manslaughter constituted prejudicial error and violated due process. We disagree and affirm.

## FACTUAL BACKGROUND

On February 27, 2013, approximately 9:20 p.m., appellant shot and killed Kathleen, his wife of 19 years. Kathleen was watching television in the living room of the couple's home when appellant fired a single round into her head from a .45-caliber semiautomatic handgun. The gunshot was "rapidly fatal."

After shooting his wife, appellant rolled her body onto a towel, which he dragged to the bathroom. He placed the body in the bathtub. Using an eight-inch knife, appellant inflicted 94 sharp force injuries to the head, torso, and upper and lower extremities of the body. Several of the knife wounds would have been fatal had Kathleen not died from the gunshot to her head. The largest of the sharp force injuries was on the abdomen, consisting of two horizontal cuts connected by a vertical cut in the

---

[1] Undesignated statutory references are to the Penal Code.

shape of an "H," which created skin flaps that could be opened to expose the interior of the abdomen. There were also knife wounds around one leg and down the sides of both legs, as well as wounds around the neck.[2] Appellant left the knife in his wife's right eye.

The next day, February 28, 2013, appellant withdrew money from the bank and set out in his wife's Mercedes for Sheri's Ranch, a brothel in Pahrump, Nevada. That evening, Nye County Sheriff Deputy Joseph Marshall pulled appellant over in Nevada. Appellant had failed to maintain his travel lane and smelled of alcohol. The deputy found a loaded .45-caliber semiautomatic handgun, a second loaded magazine for the firearm, a holster, and bullets on the front passenger seat of the car. Appellant was transported to a detention facility, where he was booked as an intoxicated person in possession of a firearm and spent the night.

On March 1, 2013, appellant checked into Sheri's Ranch, where he partied with several prostitutes over the next two nights. He told one prostitute that his wife had been killed in a car accident the week before. He also shared his interest in hunting, telling the prostitute that he had hunted deer and elk and fished salmon in Alaska.

---

[2] A Long Beach police sergeant and experienced hunter testified as an expert witness that the wounds shown in a photograph of the victim's abdomen were consistent with a hunter's act of gutting an animal. In addition, the wounds to the victim's legs were consistent with an attempt to sever the legs as a hunter might do with large game such as deer or elk.

Appellant left Sheri's Ranch sometime on Sunday, March 3, 2013. He drank the entire way back to California, consuming a 12-pack of beer before stopping at a grocery store on the way to purchase another 12-pack of beer and a fifth of Seagrams 7 Canadian whiskey, of which he drank half to two thirds that evening.

On March 3, 2013, at 7:22 p.m., appellant called 9-1-1 and reported that he had killed his wife. The operator asked for the location of his wife's body, and appellant replied, "She is in my bathtub." In response to further questions, appellant stated that he "shot her four days ago, Wednesday," in his house, but the weapon had been confiscated in Nevada.

The same evening at 10:28 p.m. Eastern time (7:28 p.m. Pacific time), Kathleen's cousin received a text message from appellant on Kathleen's cell phone. The message said, " 'Kathy is dead. Call the family. I do not recommend a viewing. I mutilated her corpse a lot.' "

When Long Beach police officers responded to the 9-1-1 dispatch at appellant's home, appellant exited the house and walked toward the officers while smoking a cigarette. An officer asked appellant if there was anyone else in the house. Appellant responded, " 'My wife.' " He paused and added, " 'She is quite dead.' " His demeanor was calm and relaxed.

Police arrested appellant and administered a breath intoxilyzer exam during the booking process. His blood-alcohol content measured .23 and .22. Police spoke with appellant that

night for about an hour.[3]  He was generally responsive to the detectives' questions.  Appellant described how he had come up behind his wife and shot her as she was watching television.  He explained that while he kept the loaded magazine in the gun he had used to kill his wife, he did not keep a round in the chamber and had to rack it before he could fire the gun.  He told police he had used only one knife and admitted taking two photos of his wife in the bathtub.  Appellant stated that he had wanted a divorce.  The detective asked appellant if he wanted to start a new life, but his wife would not allow it, and appellant responded, "Pretty much."

When police entered the home, they found Kathleen's body in a bathtub.  Duct tape covered the seams of the front door to the house.  Police recovered a .45-caliber bullet from the wall in the living room and a spent .45-caliber cartridge from the pocket of a pair of sweatpants found on the floor outside the bathroom door.  Subsequent ballistics testing revealed the bullet and cartridge case had been fired from the .45-caliber pistol confiscated from appellant in Nevada.

Police found two laptop computers in the living room.  Forensic analysis showed "Kevin" to be the only user name on both laptops.  On one of the computers, police found 446 downloaded images pertaining to celebrity deaths.  On February 23, 2013, the user had spent 39 minutes conducting searches for images related to celebrity death or crime scenes.  Two of the

---

[3] At trial appellant claimed not to remember what he said to police that night, although he acknowledged his voice on the recording of the interview.

downloaded images showed what appeared to be a dead woman's body in a bathtub.[4]

A digital camera found on the kitchen counter contained three photos of Kathleen's corpse in the bathtub. Police also found a letter written in appellant's hand and a calendar in the kitchen with appellant's writing on it.

The letter[5] stated that appellant killed his wife at 9:20 p.m. with a .45-caliber bullet to the back of the head. He waited several minutes before he moved her to the floor and then " 'rolled her onto a towel and drug [*sic*] her in the bathroom.' " Appellant wrote, " 'I noticed blood coming from her ear—then I stabbed her over and over and over until I was sure she was dead.' " The letter continued, " 'Now—cold water is running over her body to stop the smell.' " Appellant also wrote, " '11:25. No rigor mortis with cold shower on it' "; " 'It smells like a wet, dead chicken' "; " 'Maybe I should die too—not yet—he, he, he' "; " '12:30 a.m.—I stopped the cold water treatment. Still very flexible. I picked her eyeballs out of their sockets in her head. With a small shrimp fork found on the counter. Actually they are tasty with a little soy' "; " 'What to do w/ the body?' " " 'I think I'll

---

[4] At trial, appellant explained that he and his wife had searched the Internet about celebrity deaths together after watching a television show on the subject. He denied that he had specifically searched for images of a dead woman in a bathtub and asserted that he had viewed only a couple of the downloaded pictures.

[5] Appellant testified that he did not remember writing the letter, but admitted it was in his handwriting.

have some whyskey [*sic*] and sleep on it' "; " 'Maybe tomorrow [will] bring a new day.' "

The letter went on: " '12:46—decided to totally gut wife— keep smell down, much like big game.  Used kitchen scizzors [*sic*] to do the nasty' "; " 'Gut her—quite nastier than I thought.  When you look at her—she seems calm except all of her guts have been scrambled—Yeah, Kev!!' "  " '1:00 a.m.—after totally scrambling guts—put the cold water on again.  Noticed I stabbed myself in the right hand—must fix.' "  " 'Smell is BAADD [*sic*]' "; " '2 a.m.— gonna go for a ride' "; " '2:30 a.m.—came back to sleep a little. Smell = BAADD [*sic*]' "; " '12:00 p.m. Thur  Slept well in our bed. She slept in the bathtub of course.' "  The letter concluded, " 'Withdrawing money and going to Vegas.  Not really Vegas.  Got my jollies off at Sheri's Ranch.' "

Appellant testified on his own behalf.  He served on active duty in the United States Coast Guard for seventeen and a half years and in the Coast Guard Reserves as a commissioned officer for four and a half years.[6]  Kathleen was never happy with her husband's performance in the military and expressed her anger over his failure to advance quickly enough by constantly belittling and humiliating him.  She was "relentless" in calling him names.  In 2007, the couple stopped having sexual relations.

Beginning in May 2012, appellant and Kathleen separated three times due to arguments over finances and because of

---

[6] After leaving active military service, appellant worked for the Coast Guard in a civilian position, but he was forced to resign because of improper use of a government credit card and the theft of petty cash.

7

Kathleen's constant berating. After each reconciliation, Kathleen quickly resumed demeaning appellant on a daily basis, telling him, "You're no good," "I wish I wasn't married to a fucker like you," and, "I wish I wasn't married to a piece of shit like you." She regularly called him names such as " 'fucker,' " " 'fat fuck,' " " 'fuckhead,' " " 'good for nothing,' " and "imbecile." These remarks made appellant feel worthless and unloved.

Appellant spent Christmas 2012 with his mother in Virginia. After Christmas, appellant returned to California with the .45-caliber handgun and its holster and ammunition, along with several other guns he had retrieved from his mother's house.

Throughout February 2013, the couple argued several times a week, and Kathleen continued to berate appellant and call him names. Appellant wanted to show Kathleen how much she was hurting him, and on January 14, 20, 22 through 31, and February 22 through 28, he recorded the names she called him each day on the kitchen calendar where she would notice. On the days after he killed his wife, appellant wrote: " 'Good luck, fucker' "; " 'A-h-e-m. Fucker no more, my dear' "; " 'Enjoy your bath' "; and " 'Had enough.' "

The night he shot his wife, appellant had planned to celebrate a possible employment opportunity. But when he gave Kathleen the good news, she responded by ridiculing him and disparaging the job he hoped to get. Kathleen continued to criticize him, calling him a "worthless piece of shit," as appellant cooked dinner. Kathleen proceeded to yell at him as she ate the dinner he had prepared. Appellant was drinking heavily. Finally, appellant went into the bathroom and cried.

Appellant came out of the bathroom and walked down the hall to the bedroom, where he grabbed the loaded .45-caliber gun

off the dresser.  He removed the gun from its holster and walked down the hallway to the kitchen.  Standing in the doorway between the kitchen and living room, appellant fired the gun. The last thing he heard his wife say before she died was, " 'You're no good.  You're nothing but a worthless piece of—.' "

## DISCUSSION

### A. *Prosecutorial Misconduct*

Appellant contends the prosecutor committed prejudicial misconduct by misstating the law regarding voluntary intoxication and heat of passion in closing argument to the jury. Appellant, however, failed to object or request an admonition regarding any of the statements he claims amounted to misconduct, and thus forfeited the issue on appeal.  In any event, appellant's claim fails on the merits because any misstatement of the law was undeniably harmless.

### 1. *Appellant forfeited any claim of prosecutorial misconduct by failing to object.*

To preserve a misconduct claim for review on appeal, " 'a defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the improper argument.' " (*People v. Linton* (2013) 56 Cal.4th 1146, 1205; *People v. Thomas* (2012) 54 Cal.4th 908, 937.)  The underlying purpose of this requirement is to " ' "encourage a defendant to bring errors to the attention of the trial court, so that they may be corrected or avoided and a fair trial had . . . ." ' " (*People v. Saunders* (1993) 5 Cal.4th 580, 590.)  "The objection requirement is necessary in criminal cases because a 'contrary rule would deprive the People of the opportunity to cure the defect at trial and would "permit the defendant to gamble on an acquittal at his trial secure in the knowledge that a conviction would be reversed

9

on appeal." ' " (*People v. Partida* (2005) 37 Cal.4th 428, 434.) Indeed, it would be " ' "*unfair to the trial judge and to the adverse party* to take advantage of an error on appeal when it could easily have been corrected at the trial." ' " (*People v. Saunders, supra,* 5 Cal.4th at p. 590.)

Here, appellant addresses the absence of any objection or request for a curative admonition by asserting that an admonition in this case would not have cured the harm, citing *People v. Alvarado* (2006) 141 Cal.App.4th 1577, 1585 (*Alvarado*). But appellant fails to make any showing that an objection and admonition would have been futile, and his reliance on *Alvarado* is misplaced. In *Alvarado*, this court found the prosecutor's improper vouching for the integrity of her office and the victim, her argument that defendant was the perpetrator because he was the person charged, and other improper statements in rebuttal constituted prejudicial misconduct. Given the overall weakness of the prosecution's case, we concluded that "the challenged comments were so prejudicial that an admonition would not have dispelled the harm." (*Id.* at pp. 1585–1586.)

The same cannot be said for the instant case. Here, the trial court properly instructed the jury on the principles of voluntary intoxication and heat of passion, and, as we discuss below, any misstatements of the law by the prosecutor were harmless. We therefore conclude that appellant forfeited his claim of prosecutorial misconduct by failing to object or seek an admonition to the jury.[7]

---

[7] Appellant's attempt to avoid forfeiture of his claim by asserting that defense counsel's failure to object to the

10

### *2. Any misstatement of the law regarding the jury's consideration of evidence of voluntary intoxication was harmless.*

Appellant contends the prosecutor misstated the law by informing the jury that it could consider the effect of voluntary intoxication on appellant's *capacity* to premeditate, deliberate, and harbor express malice.[8]  Since evidence of voluntary

---

prosecutor's argument amounted to ineffective assistance of counsel fails for the same reason.  (See *People v. Centeno* (2014) 60 Cal.4th 659, 674; *People v. Anzalone* (2006) 141 Cal.App.4th 380, 393; *Strickland v. Washington* (1984) 466 U.S. 668, 687–688, 694.)  "Ineffective assistance of counsel under the Sixth Amendment entails deficient performance under an objective standard of professional reasonableness and prejudice under a similarly objective standard of a reasonable probability of a more favorable outcome in the absence of the deficient performance." (*People v. Cole* (2004) 33 Cal.4th 1158, 1202, fn. 11.)  Because we conclude that any misconduct by the prosecutor was harmless, appellant cannot meet his burden of showing a reasonable probability of a different outcome had defense counsel made a timely objection, and his claim of ineffective assistance of counsel fails.

[8] Specifically, the prosecutor argued on rebuttal:  "*The only issue* with alcohol is was he *able* to have a goal and think about how to obtain that goal or did alcohol stop him from being able to do that.  [¶]  Was he *unable* to form the intent to kill?  [¶]  That's *the only thing* that alcohol goes to.  [¶]  . . .  [¶]  You can consider [voluntary intoxication] as to specific intent and premeditation during deliberation; that's it.  [¶]  And by 'consider,' it doesn't mean, oh, he drank a whole bunch of alcohol so the alcohol caused him to kill.  No.  That's not what that is talking about.  [¶]  . . .  [¶]  But the question is:  Did alcohol stop the defendant from

---

intoxication was admissible solely on the issue of whether he actually formed the requisite intent, appellant asserts that the misstatement substantially lightened the prosecutor's burden of proof on the issue of intent.  Not so.

The worst that can be said about the prosecution's argument in this regard is that its fleeting reference to the defendant's ability to form the intent to kill was somewhat misleading.  But the prosecutor's argument appropriately emphasized the evidence showing that despite his voluntary intoxication appellant actually had the requisite mental state for first degree murder.  The prosecutor thus properly argued that "we know for sure that [appellant] *formed the intent to kill*" based on his choice of a loaded gun, the act of shooting his wife in the head, and his use of a knife to stab her in the chest.  (Italics added.)  The prosecutor further argued that appellant's actions together with the letter he wrote chronicling the details of the killing and mutilation demonstrated "that *he had the intent to kill.*  [¶]  In fact, when he thought that she might still be alive, he made sure she [was] dead."  (Italics added.)

Even if the remarks concerning voluntary intoxication amounted to a misstatement of the law, the error was harmless.  The trial court fully and correctly instructed the jury on the significance of voluntary intoxication, stating that the jury could consider evidence of voluntary intoxication "only in a limited

---

being *able* to form intent to kill or premeditation and deliberation?  Did it stop him from being *able* to be goal-oriented?  [¶]  So it's not was he over the legal limit for driving?  There are functioning alcoholics.  [¶]  The issue is:  Was he *capable* to form that intent?"  (Italics added.)

12

way," to decide "whether the defendant acted with an intent to kill or the defendant acted with deliberation and premeditation," and the jury "may not consider evidence of voluntary intoxication for any other purpose." The court also instructed that the jury must abide by the court's instructions if any of the attorneys' comments conflicted with the jury instructions given. (CALCRIM No. 200.) In the absence of any evidence of confusion on the part of the jury, "[j]urors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions." (*People v. Sanchez* (2001) 26 Cal.4th 834, 852; *People v. Osband* (1996) 13 Cal.4th 622, 717 [" '[w]e presume that jurors treat the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade' "].)

Finally, given the letter appellant wrote describing his actions, the evidence supporting a finding that appellant had the requisite mental state for first degree murder was overwhelming, whereas the evidence of appellant's intoxication at the time of the killing—consisting of his own testimony that he was drinking that night and the presence of empty containers of alcohol around the house—was extremely weak. Given this state of the evidence, we do not find any diminution of the prosecution's burden of proof on the issue of appellant's intent, and we deem harmless any misstatement of law by the prosecutor regarding voluntary intoxication.

### 3. Any misstatement of law regarding heat of passion does not warrant reversal.

Appellant contends the prosecutor misstated the law in rebuttal by asserting that in order to reduce the killing from murder and convict of voluntary manslaughter based on heat of

13

passion, the jury was required to find that a reasonable person would have fired a loaded gun at the victim's head.  However, we conclude that even if the prosecutor's argument constituted a misstatement of the law, it did not amount to a violation of due process, and any error was harmless.

In *People v. Beltran* (2013) 56 Cal.4th 935 (*Beltran*), our Supreme Court explained the legal standard of provocation, holding that to adopt "a standard requiring such provocation that the ordinary person of average disposition would be moved to *kill* focuses on the wrong thing.  The proper focus is placed on the defendant's state of mind, not on his particular act.  To be adequate, the provocation must be one that would cause an emotion so intense that an ordinary person would simply *react*, without reflection. . . .  [P]rovocation is not evaluated by whether the average person would *act* in a certain way:  to kill.  Instead, the question is whether the average person would *react* in a certain way:  with his reason and judgment obscured." (*Beltran*, at p. 949.)

Here, the prosecutor argued that appellant did not kill his wife in the heat of passion:

"Heat of passion means you killed someone because of a sudden quarrel or in heat of passion due to being provoked.  [¶] . . . The provocation would have caused a person of average disposition to act rashly and without due deliberation. . . .  [¶] It's not enough that the defendant was simply provoked.  The defendant is not allowed to set up his own standard of conduct. [¶]  In deciding whether the conduct is sufficient, consider whether a person of average disposition in the same situation and knowing the facts would have reacted from passion rather than judgment.  [¶]  So it's not the defendant.  *It's an average*

14

*person would have done the same thing.* [¶] First of all, was it sudden? No. He says that the victim has belittled him, questioned his choice of jobs, name-called him, gave him little sex since 2004. [¶] In fact, on cross-examination, he admitted same old, same old that day. Nothing new. [¶] She had said to him in the past, if you believe him, his job choice wasn't good enough. He didn't kill her back then. [¶] She has called him names before, if you believe him. Didn't kill her. [¶] There's nothing different about this day, if you believe what he says. [¶] *Is it what a reasonable person would have done?* He can't set his own standards. [¶] Six-foot man that weighs 100 more pounds than the 5-1 female. He is younger and stronger. *What would a reasonable person do?* Would a reasonable person leave? Kick her out? Cover her mouth? Get her attention? Fire a warning shot? [¶] *Or grab a loaded gun, rack it, walk up behind her, aim at her head and pull the trigger?* [¶] *You have to find that this is what a reasonable person would do* to find manslaughter in this case, based on his statement alone." (Italics added.)

The prosecutor's remarks incorrectly informed the jury that provocation is sufficient to reduce a murder to manslaughter only if "a reasonable person would have done" what appellant did, that is, shoot his wife in the head. Although such remarks amount to a misstatement of the legal standard regarding provocation under *Beltran, supra,* 56 Cal.4th 935, we nevertheless find that the statements do not require reversal in this case.

A prosecutor's misconduct constitutes a federal constitutional violation " ' " 'when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." ' " ' " (*People v. Hill* (1998) 17 Cal.4th 800, 819; *People v. Thomas, supra,*

15

54 Cal.4th at p. 937.)  Conduct by a prosecutor is misconduct under state law " ' "only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury." ' " (*People v. Linton*, *supra*, 56 Cal.4th at p. 1205; *People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 305; *Hill*, *supra*, 17 Cal.4th at p. 819.)  In this regard, "What is crucial to a claim of prosecutorial misconduct is not the good faith *vel non* of the prosecutor, but the potential injury to the defendant. [Citation.]  When . . . the claim focuses on comments made by the prosecutor before the jury, a court must determine at the threshold how the remarks would, or could, have been understood by a reasonable juror.  [Citations.]" (*People v. Benson* (1990) 52 Cal.3d 754, 793.)  The standard is an objective one.  (*People v. Berryman* (1993) 6 Cal.4th 1048, 1072.)  To determine whether there is prosecutorial misconduct under state law, " ' " 'the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' " ' " (*People v. Linton*, *supra*, 56 Cal.4th at p. 1205; *People v. Morales* (2001) 25 Cal.4th 34, 44.)

In *Hill*, *supra*, 17 Cal.4th 800, the prosecutor engaged in a pattern of conduct which included misstating the facts relating to the evidence and witnesses' testimony, misstating the law, making improper references to alleged facts outside the record, and threatening to charge a witness with perjury if the witness testified for the defense.  The court found the prosecutor's conduct to be so egregious that it violated the defendant's due process rights under the United States Constitution and thereby amounted to prosecutorial misconduct requiring reversal.

No such pattern appears in the instant case, and, unlike *Hill*, the prosecutor's fleeting misstatements of the legal standard

16

regarding provocation were not so egregious as to amount to a denial of due process. (*People v. Thomas*, *supra*, 54 Cal.4th at p. 937.) As the Supreme Court has explained, " 'it is not enough that the prosecutor's remarks were undesirable or even universally condemned.' [Citation.] The relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " (*Darden v. Wainwright* (1986) 477 U.S. 168, 181.)

The misstatements regarding provocation would also not require reversal under state law because there appears no reasonable likelihood that the jury relied on the prosecutor's remarks to appellant's detriment. The trial court instructed the jury with CALCRIM No. 570, voluntary manslaughter based on heat of passion.[9] And as set forth above, we presume the jury followed the court's instructions over any misstatements of law by the prosecutor. (*People v. Sanchez, supra*, 26 Cal.4th at p. 852; *People v. Osband, supra*, 13 Cal.4th at p. 717.)

---

[9] The instruction provides in relevant part: "As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment; and [¶] . . . The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment. [¶] . . . [¶] It is not enough that the defendant simply was provoked. The defendant is not allowed to set up his own standard of conduct. . . . In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment."

17

Finally, the prosecutor's misstatements of law regarding provocation were undeniably harmless. In returning a verdict of first degree murder, the jury expressly found that appellant premeditated and deliberated the killing of his wife. And the evidence strongly supported the jury's conclusion. But such a "state of mind, involving planning and deliberate action, is manifestly inconsistent with having acted under the heat of passion—even if that state of mind was achieved after a considerable period of provocatory conduct—and clearly demonstrates that defendant was not prejudiced" by any misstatements of law by the prosecutor. (*People v. Wharton* (1991) 53 Cal.3d 522, 572.)

## B. *Instructional Error*

The trial court instructed the jury: "The following crime and allegations require general criminal intent: voluntary manslaughter." Appellant contends the trial court prejudicially erred in instructing the jury that voluntary manslaughter required only general criminal intent, and the error violated appellant's constitutional right to due process. We disagree.

A conviction for voluntary manslaughter requires that the defendant acted either with an intent to kill or with conscious disregard for life (i.e., the mental state ordinarily sufficient to constitute malice aforethought). (*People v. Bryant* (2013) 56 Cal.4th 959, 970.) Citing *People v. Whitfield* (1994) 7 Cal.4th 437, 450 (*Whitfield*) (superseded by statute on another point as stated in *People v. Timms* (2007) 151 Cal.App.4th 1292, 1297), appellant asserts the instruction was error because voluntary manslaughter is "a specific intent or mental state offense that

required a specific intent to kill or a mental state of conscious disregard for life."[10]

Even assuming the trial court's characterization of voluntary manslaughter as a general intent crime was wrong, the remainder of the court's instructional charge correctly identified the necessary elements of first and second degree murder and voluntary manslaughter, as well as the requisite mental state for voluntary manslaughter. In such circumstances, "[w]e must consider whether it is reasonably likely that the trial court's instructions caused the jury to misapply the law. [Citations.] '[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.' " (*People v. Carrington* (2009) 47 Cal.4th 145, 192; *People v. Solomon* (2010) 49 Cal.4th 792, 822.)

Here, the court instructed that in order to find appellant guilty of murder, the People must prove that, when appellant acted, "he had a state of mind called malice aforethought." The instruction explained: "There are two kinds of malice aforethought, express malice and implied malice. . . . [¶] The defendant acted with express malice if he unlawfully intended to

---

[10] *Whitfield* involved admission of evidence of voluntary intoxication on the issue of whether the defendant formed the mental state of implied malice in a prosecution for second degree murder. The Supreme Court declared that, while implied malice does not fall literally within the description of general or specific intent, it is "closely akin" to specific intent, "which requires proof that the defendant acted with a specific and particularly culpable mental state." (7 Cal.4th at p. 450.)

kill," and he "acted with implied malice if . . . [¶] . . . [¶] [h]e deliberately acted with conscious disregard for human life." (CALCRIM No. 520.)

The court further instructed: "The defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately, and with premeditation. The defendant acted willfully if he intended to kill. The defendant acted deliberately if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. The defendant acted with premeditation if he decided to kill before completing the acts that caused death." The instruction continued, "The People have the burden of proving beyond a reasonable doubt that the killing was first degree murder rather than a lesser crime." (CALCRIM No. 521.)

The jury was also instructed that "[p]rovocation may reduce a murder from first degree to second degree and may reduce a murder to manslaughter" (CALCRIM No. 522), and that "[a] killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion. [¶] . . . [¶] The People have the burden of proving beyond a reasonable doubt that the defendant did not kill as the result of a sudden quarrel or in the heat of passion. If the People have not met this burden, you must find the defendant not guilty of murder." (CALCRIM No. 570.)

Viewing the instructions as a whole, it is clear the jury was properly instructed on the requisite mental state for voluntary manslaughter. Moreover, pursuant to the court's instructions, the jury could not convict appellant of first degree murder without finding that he had an express intent to kill and that at the time of the killing he was not acting under the influence of a

sudden quarrel or heat of passion.  Thus, even assuming the trial court's classification of voluntary manslaughter as a general intent crime was misleading, the characterization was irrelevant to the issues of whether he acted willfully, deliberately and with premeditation.  Accordingly, there appears no likelihood that the trial court's instructions caused the jury to misapply the law in this case (*People v. Carrington*, *supra*, 47 Cal.4th at p. 192), and any error in the instructions which characterized the mental state for voluntary manslaughter as one of general intent must be deemed harmless beyond a reasonable doubt.  (*Chapman v. California* (1967) 386 U.S. 18, 36.)

## DISPOSITION

The judgment is affirmed.

CERTIFIED FOR PUBLICATION.


LUI, J.

We concur:


ROTHSCHILD, P. J.


CHANEY, J.

21