Filed 5/31/24  P. v. Castaneda CA6
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MIGUEL CASTANEDA,<br><br>    Defendant and Appellant. | H050460<br>(Santa Cruz County<br>Super. Ct. No. 18CR02411) |

A jury convicted Miguel Castaneda of the murder of Victor Vasquez (Pen. Code, § 187, subd. (a))[1] and of assault with a firearm on Juan M.[2]  (§ 245, subd. (a)(2)).  The trial court sentenced Castaneda to an aggregate indeterminate term of 35 years to life.  On appeal, Castaneda contends that the prosecutor misstated the reasonable doubt standard and the law regarding provocation and thus deprived Castaneda of his constitutional right to a fair trial.

For the reasons stated below, we affirm the judgment.

---

[1] Unspecified statutory references are to the Penal Code.

[2] We refer to the surviving victim and civilian witnesses by their first name and last initial and/or by initials to protect their privacy interests.  (See Cal. Rules of Court, rule 8.90(b)(4), (10), (11).)

## I. FACTS AND PROCEDURAL BACKGROUND[3]

A. *Facts and Charges*

Castaneda was married to D.B.P., with whom he was raising two sons and two daughters, including G.D.C. G.D.C. was born in 2014. A year or two later, Castaneda found out that D.B.P. and Vasquez were having an affair and that G.D.C. was their biological child. D.B.P. and Castaneda divorced in 2016 but continued living together as roommates. Castaneda blamed Vasquez for ruining his marriage.

Castaneda began a romantic relationship with a woman in Mexico. Castaneda and D.B.P. discussed Castaneda moving with their sons to Mexico, where Castaneda's pregnant girlfriend lived, while the daughters, including G.D.C., would stay with D.B.P.

In or around 2018, Vasquez sought to gain custody of G.D.C. and change her last name to his. On April 20, 2018, Castaneda, D.B.P., Vasquez, and Vasquez's friend, Juan, attended a court hearing regarding Vasquez's request for custody, visitation, and name change. The morning of the hearing, Castaneda put a gun under the floor mat of his truck.

During the hearing, Castaneda learned that D.B.P. and Vasquez had been sexually intimate two days before. In the courtroom, the parties were calm and not yelling. After the hearing concluded, Castaneda approached Vasquez in a confrontational manner in the hallway outside the courtroom. The courtroom bailiff intervened. Vasquez and Juan were asked to leave the courthouse first, while the courtroom bailiff kept Castaneda waiting with her in the courthouse for approximately one to two minutes before another officer escorted Castaneda outside. Castaneda calmed down after the bailiff's intervention and was not agitated as he waited to leave the courthouse.

---

[3] We set forth the relevant facts in the light most favorable to the jury's verdict. (*People v. Luo* (2017) 16 Cal.App.5th 663, 668, fn. 2; *People v. Campbell* (2020) 51 Cal.App.5th 463, 469.)

2

Vasquez and Juan left the courthouse in Vasquez's black BMW and proceeded along Riverside Drive. Castaneda subsequently left the courthouse in his truck and also proceeded along Riverside Drive. Vasquez proceeded at or below the speed limit, whereas Castaneda drove quickly and recklessly, weaving in and out of the lanes. Castaneda cut off Vasquez, causing a collision.

Castaneda, Vasquez, and Juan exited the vehicles. Vasquez and Juan were unarmed. Castaneda carried a gun as he approached the two men. Castaneda shot Vasquez multiple times, including as Vasquez ran away. Vasquez fell to the ground. After Vasquez had fallen, Castaneda shot Vasquez in the head at close range. Castaneda then pointed the gun at Juan and said, " 'You're next.' " Juan responded, " 'Why me?,' " after which Castaneda put the gun down.

In March 2022, the Santa Cruz County District Attorney filed a first amended information charging Castaneda with the murder of Vasquez (§ 187, subd. (a); count 1) and assault of Juan with a firearm (§ 245, subd. (a)(2); count 2), with firearm enhancements for each count (§§ 12022.5, 12022.53).

B. *Jury Instructions*

At the beginning of the trial and before opening statements, the trial court issued standard instructions to the jury, including CALCRIM No. 220, which sets forth the prosecutor's burden of proving the defendant's guilt beyond a reasonable doubt.[4] The

---

[4] The text of the instruction states: "The fact that a criminal charge has been filed against the defendant is not evidence that the charge is true. You must not be biased against the defendant just because he has been arrested, charged with a crime, or brought to trial. [¶] A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt. [¶] Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt. [¶] In deciding whether the People have proved their case beyond a reasonable doubt, you must
(continued)

day before closing arguments, the trial court reiterated CALCRIM No. 220. In addition to CALCRIM No. 220, the court gave the jury other instructions stating that it is the prosecution's burden to prove elements of the charges beyond a reasonable doubt. (See, e.g., CALCRIM Nos. 224, 225, 359, 361, 505, 520, 521, 571, 640, 3146, 3149, 3470, 3517.)

The trial court gave standard jury instructions on assessing the evidence and the charges against Castaneda, including instructions regarding provocation and heat of passion as factors that can reduce murder to voluntary manslaughter. The trial court used CALCRIM No. 570 to set forth the elements of heat of passion: "1. The defendant was provoked by the victim; [¶] 2. As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment; [¶] AND [¶] 3. The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment." The instruction further stated that "[h]eat of passion does not require anger, rage, or any specific emotion. It can be any violent or intense emotion, other than revenge, that causes a person to act without due deliberation and reflection."

Just before the prosecution began its closing argument, the trial court reminded the jury that the prosecution bears "the burden of proof." The court instructed the jury that "if anything counsel says conflicts with [the trial court's] instructions on the law, [they] must be guided by [the trial court's] instructions. [The attorneys are] allowed to give their interpretation of the law but the law is as [the trial court has] instructed."

C. *Closing Arguments*

In closing arguments, the prosecutor discussed her burden of proving Castaneda's guilt beyond a reasonable doubt and quoted from the language set forth in CALCRIM

---

impartially compare and consider all the evidence that was received throughout the entire trial. Unless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty." (CALCRIM No. 220.)

No. 220.  In elaborating on the reasonable doubt standard, the prosecutor stated, "So what is reasonable doubt not?  It is not 100% certainty.  It's something reasonable that would say that the defendant was innocent.  It's not doubt based on conjecture or speculation.  If you find yourselves in the jury room, well, what if or it's possible that, that's not what we're talking about here, we're talking about reasonable doubt.  [¶]  And when you think about what this burden is, it's the highest burden we have in the law and appropriately so this is the government levying a charge.  But it is the same burden that is used in every criminal case, in every criminal trial in this country from DUI, petty theft - -."  Castaneda's trial counsel objected, citing "[i]mproper argument."  The trial court overruled the objection.

Immediately thereafter, the prosecutor characterized the burden of proof: "It's the same burden that's used in every criminal case from petty theft all the way up to murder.  [¶]  And this isn't to minimize the burden, as I mentioned, it's a high one, but the goal is not to create loopholes or technicalities for people to avoid accountability, it's truly to prevent the conviction of innocent people."

When the prosecutor turned to a discussion of the charges, she described the circumstances under which murder could be reduced to voluntary manslaughter and quoted the elements of "heat of passion" from the CALCRIM No. 570 instruction.  She later said, "heat of passion, manslaughter is this immediacy.  It's so provocative, it's almost a universal reaction.  It's triggering something primal, not just in the defendant but primal in the average person.  It's essentially eliminating the functioning of the frontal lobes potentially causing like a disassociative [*sic*] experience where someone is on autopilot instead of engaging in some goal-directed behavior.  So you expect some sort of overkill in that situation."  Castaneda's trial counsel did not object.  In the defense closing argument, counsel told the jury that "[o]ne other thing of note is that fear and panic with an imminent threat can also be a reason that someone enters into that fugue

5

state, that heated passion, into that instinctual push, that movement that is no longer dictated by deliberation or conscious thought or less conscious thought."

The prosecutor discussed scenarios which may trigger heat of passion: "So as time has gone on, what would provoke an average person. Laws about heat of passion have been on the books for a very long time to include when women had no rights and this could be used to reduce the killing of women for infidelity for whatever might have enraged the passions of their husbands. But in this day and age where infidelity is common, where divorce is common, what would cause an average person to act, to react in this way is very different. [¶] Just for an example, which I've given you, this covers the primal nature, the universal reaction and the immediacy. [¶] And so we have parents on the jury. You're at home and your neighbor is there and you're watching a movie -- and I'm using a cassette tape as an example -- and you pop a movie in and you find that your neighbor, who is sitting in your living room, has molested your child and filmed it and you see that. And there's a knife sitting there and you lose it, you go on autopilot and stab or kill or whatever. That's what we're talking about provocation. Where it's so understandable, the victim did something so terrible, so provocative that the murder has now been reduced to something else. [¶] Often -- and I'll be frank -- heat of passion could be used to explain when someone kills when discovering infidelity. Okay. But the situation that th[ey] might apply is a partner walking into the room and seeing their loved one in the thro[e]s of passion with someone else and grabbing a weapon that's readily available right then. Not killing the person who slept with your wife two years later." At this point, trial counsel objected, citing "improper argument," and argued that the prosecutor was "creating a false legal standard." The trial court overruled the objection and stated, "It's appropriate legal argument."

The prosecutor argued that the jury should not convict Castaneda of manslaughter rather than second degree murder. She asked, "What would the second element need to be to reduce murder to manslaughter? As a result of the provocation, the defendant acted

6

rashly and under the influence of intense emotion other than revenge that obscured his reasoning or judgment. This is why there were so many questions about his behavior in court, after court, after the shooting because a calm, cool, collected person is not one who has been – who has lost their ability to act with judgment and reason. He's in control the entire time, both before and after the shooting."

The prosecutor concluded this argument by stating, "So the final element that would have to be true to mitigate murder to manslaughter is that this provocation would also have caused a person of average disposition to act rashly and without due deliberation. [¶] And I would submit to you that the level of provocation or whatever [Vasquez] did certainly would not have caused the same reaction in an average person." Castaneda's trial counsel did not object.

During rebuttal, the prosecutor revisited heat of passion and showed the jury the applicable jury instruction. The prosecutor asked the jury to question the defense's arguments: "That a car collision after [Castaneda] is seen driving recklessly, justifies the killing of the person you crashed into. Saying that a car crash is enough to insight [*sic*] that emotion in someone to execute them on the road. That Victor posed an imminent threat of causing death or GBI before the first shot, second shot, third shot when he fell to the ground before he was executed." Trial counsel objected on the grounds it was " 'improper argument.' " The trial court overruled the objection and stated that the prosecutor's argument was "not improper."

D. *Jury's Verdict and Castaneda's Sentence*

The jury returned a not guilty verdict on count 1, first degree murder (§§ 187, 189), returned a guilty verdict on the lesser included offense of second degree murder (§ 187), finding true two firearm enhancements (§ 12022.53, subds. (a), (d)), and returned a guilty verdict on count 2, assault with a firearm (§ 245, subd. (a)(2)), finding true one firearm enhancement (§ 12022.5, subd. (a)).

7

The trial court sentenced Castaneda to an aggregate indeterminate term of 35 years to life in prison.

## II.  DISCUSSION

Castaneda asserts that the prosecutor misstated the beyond a reasonable doubt standard in a manner that reduced the prosecution's burden of proof, both by shifting the burden to Castaneda and by suggesting the burden is " 'less rigorous than the law requires,' " thereby violating Castaneda's Fifth, Sixth, and Fourteenth Amendment rights. Castaneda further contends that the prosecutor misstated the law regarding provocation by asking the jury to consider Castaneda's actions rather than his state of mind, and by telling the jury they could find Castaneda was provoked if the provocation resulted in Castaneda entering into a " 'diassociative [*sic*]' " state wherein Castaneda acted on " 'autopilot' " and his " 'frontal lobes' " ceased to function and "his mind became 'primal [in] nature.' "

A. *Legal Principles*

1. <u>Reasonable Doubt</u>

A criminal defendant is presumed innocent, and it is the prosecution's burden to prove them guilty beyond a reasonable doubt.  (§ 1096; *Victor v. Nebraska* (1994) 511 U.S. 1, 5.)  Section 1096 defines "[r]easonable doubt":  " 'It is not a mere possible doubt; because everything relating to human affairs is open to some possible or imaginary doubt. It is that state of the case, which, after the entire comparison and consideration of all the evidence, leaves the minds of jurors in that condition that they cannot say they feel an abiding conviction of the truth of the charge.' "

2. <u>Heat of Passion/Provocation</u>

A murder charge may be reduced to voluntary manslaughter if the jury finds that the defendant was provoked and acted "upon a sudden quarrel or heat of passion," rather than with express or implied malice.  (§ 192; see also *People v. Beltran* (2013) 56 Cal.4th 935, 941 (*Beltran*).)

8

The standard focuses on the defendant's state of mind.  (*Beltran*, *supra*, 56 Cal.4th at p. 949.)  "Heat of passion arises if, ' "at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment." ' "  (*Id.* at p. 942.)

"How the killer responded to the provocation and the reasonableness of the response is not relevant to sudden quarrel or heat of passion."  (*People v. Najera* (2006) 138 Cal.App.4th 212, 223 (*Najera*).)

" '[I]f sufficient time has elapsed between the provocation and the fatal blow for passion to subside and reason to return, the killing is not voluntary manslaughter.' "  (*Beltran*, *supra*, 56 Cal.4th at p. 951.)

### 3.  <u>Prosecutorial Misconduct</u>

"[A] prosecutor is allowed to vigorously argue the case and is afforded 'significant leeway' in discussing the facts and the law in closing argument."  (*People v. Azcona* (2020) 58 Cal.App.5th 504, 516.)  However, " '[i]t is improper for the prosecutor to misstate the law generally [citation], and particularly to attempt to absolve the prosecution from its prima facie obligation to overcome reasonable doubt on all elements.' "  (*People v. Hill* (1998) 17 Cal.4th 800, 829; *People v. Bell* (2019) 7 Cal.5th 70, 111 (*Bell*).)

" 'To preserve for appeal a claim of prosecutorial misconduct, the defense must make a timely objection at trial and request an admonition; otherwise, the point is reviewable only if an admonition would not have cured the harm caused by the misconduct' [citation], or if 'an objection would have been futile.' "  (*People v. Fernandez* (2013) 216 Cal.App.4th 540, 561.)  " '[T]he absence of a request for a curative admonition does not forfeit the issue for appeal if "the court immediately overrules an objection to alleged prosecutorial misconduct [and as a consequence] the

9

defendant has no opportunity to make such a request." ' " (*People v. Mendoza* (2016) 62 Cal.4th 856, 905.)

"Under federal jurisprudence, a prosecutor's misconduct constitutes a deprivation of due process when the pattern of conduct is so egregious that it infects the trial with unfairness." (*People v. Perez* (2017) 18 Cal.App.5th 598, 623 (*Perez*), citing *People v. Bennett* (2009) 45 Cal.4th 577, 594–595.) "Under state jurisprudence, the misconduct must involve the use of deceptive or reprehensible methods to persuade the court or the jury." (*Perez*, at p. 623, citing *People v. Cash* (2002) 28 Cal.4th 703, 733.)

Federal constitutional error is harmless if, beyond a reasonable doubt, the error did not affect the outcome of the trial. (*Chapman v. California* (1967) 386 U.S. 18, 24; see also *People v. Cook* (2006) 39 Cal.4th 566, 608.) Prosecutorial misconduct that violates state law will not result in a reversal of the verdict unless it is reasonably probable that the jury would have reached a result more favorable to the defendant in the absence of the error. (*People v. Wallace* (2008) 44 Cal.4th 1032, 1071; see also *People v. Watson* (1956) 46 Cal.2d 818, 836.)

"[A]n appellate court reviews a trial court's ruling on prosecutorial misconduct for abuse of discretion." (*People v. Alvarez* (1996) 14 Cal.4th 155, 213.) We review counsel's arguments "in the context in which they are made" (*Boyde v. California* (1990) 494 U.S. 370, 385), including the prosecution's entire argument and the jury instructions, to determine whether "there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.' " (*People v. Centeno* (2014) 60 Cal.4th 659, 667 (*Centeno*).) However, " 'we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' " (*Ibid*.)

10

B. *Analysis*

    1. <u>Forfeiture</u>

The Attorney General argues that Castaneda forfeited his claims on appeal because he either failed to object or failed to state a legal ground for his objections. Castaneda maintains he did not forfeit his claims because any objection would have been futile given that the trial court did not sustain any of his trial counsel's objections during the prosecution's closing argument and once told his trial counsel that the prosecution could " 'argue anyway [they] want.' "

Castaneda's trial counsel failed to timely object—or object at all—to three of the prosecutor's statements at issue here: What constitutes reasonable doubt; the comments about heat of passion triggering something primal, eliminating the functioning of the frontal lobes, and causing someone to go into a dissociative state or on autopilot; and whether the provocation would have caused the same reaction in an average person. We do not agree that the record supports a conclusion that objections by trial counsel to these statements would have been futile.

Nevertheless, as both parties have addressed the merits of their respective claims in their briefing, we will assume arguendo that the claims of prosecutorial misconduct were preserved for our review and will address them on the merits.[5]

    2. <u>Reasonable Doubt</u>

Castaneda contends the prosecutor misstated the law with respect to the reasonable doubt standard in two instances and did so in a manner that improperly reduced the prosecution's burden and shifted the burden to the defense.

Castaneda asserts that the prosecutor misstated the reasonable doubt standard when she told the jury in her closing argument that their " 'job as jurors is to look at the

---

[5] Because we consider Castaneda's claims on the merits, we need not address his alternative claim of ineffective assistance of counsel for his trial counsel's failure to object to the challenged prosecution statements during closing argument.

global facts, look at the entirety of the evidence, how do the pieces fit together, and what conclusion can you draw from that evidence. [¶] So what is reasonable doubt not? It is not 100% certainty. *It's something reasonable that would say the defendant was innocent.* It's not doubt based on conjecture or speculation. If you find yourselves in the jury room, well, what if or it's possible that, that's not what we're talking about here, we're talking about reasonable doubt.' " Although his trial counsel did not timely object, Castaneda contends that the prosecutor's statement in italicized text "was a clear misstatement of the law" in that "it told the jurors that they could vote not guilty only if there was some reasonable evidence presented at trial 'that would say the defendant was innocent,' " thereby shifting the burden of proof from the prosecution to the defense.

The court correctly instructed the jurors—at the beginning of trial and again the day before closing arguments began—on the presumption of innocence, the reasonable doubt standard, and the prosecutor's burden of proof. Moreover, many of the instructions given to the jury reiterated that the prosecution bears the burden of proof beyond a reasonable doubt. (See, e.g., CALCRIM Nos. 224, 225, 359, 361, 505, 520, 521, 571, 640, 3146, 3149, 3470, 3517.) In addition, the prosecutor reminded the jurors of the trial court's instructions and correctly paraphrased CALCRIM No. 220 in her argument.

Furthermore, when viewed in context of the prosecution's argument, it is clear that the prosecutor was not telling the jury that there must be reasonable evidence that Castaneda is innocent. The question immediately preceding the claimed misstatement and the sentence following it both indicate that she is talking about the reasonableness of the doubt the jury may have. Additionally, the prosecutor stated in both the initial closing argument and the rebuttal argument that it is the prosecution's burden to demonstrate beyond a reasonable doubt that Castaneda was guilty of the charged crimes. The prosecutor neither misstated the reasonable doubt standard nor shifted the People's burden of proof to the defense.

12

Given that "[t]he jury had been properly instructed on the reasonable doubt standard, and the prosecutor's argument specifically brought their attention to this instruction" (*Bell*, *supra*, 7 Cal.5th at p. 111), the prosecutor's statement did not misstate or undermine the reasonable doubt standard.

Castaneda further asserts prosecutorial misconduct when the prosecutor told jurors that the reasonable doubt standard " 'is the same burden that is used in every criminal case, in every criminal trial in this country from DUI, petty theft --.' " (Italics omitted.) Castaneda argues that such a statement had no purpose "other than to attempt to downplay or trivialize the beyond a reasonable doubt standard."

Both before and after the objection from trial counsel, the prosecutor expressly stated that their burden of proof is "a high one", "the highest burden we have in the law" and the examples given were not "to minimize the burden."

We disagree with Castaneda's contention that the prosecutor attempted to reduce the People's burden of proof. Her statements emphasized the significance and weight of the standard.

### 3. Heat of Passion/Provocation

Castaneda contends that during closing argument the prosecutor misstated the law regarding provocation in two ways.

Castaneda maintains the prosecutor misstated the law with respect to provocation by suggesting the jury could find Castaneda acted pursuant to that provocation "only if they found that [Castaneda] was so provoked that 'the functioning of [his] frontal lobes' was 'eliminat[ed],' that he entered into a 'disassociative [*sic*] experience,' that his mind became 'primal [in] nature,' and that his brain went 'on autopilot.' "

13

Contrary to Castaneda's assertion in his briefing in this court, his trial counsel did not make a contemporaneous objection to this statement.**⁶**  Indeed, trial counsel likewise made arguments about Castaneda being in a "fugue" state during his closing argument, suggesting that he did not consider the prosecutor's statement improper.  Nor did the prosecutor tell the jurors that they could conclude Castaneda acted in response to provocation "only if" they found Vasquez had so provoked Castaneda to cause such a change in his state of mind.

In addition, when viewed in the context of the prosecutor's argument as a whole, the prosecutor's statement merely provides examples of states of mind in which reasoning and judgment are absent.  As the California Supreme Court has stated, "the provocation must be one that would cause an emotion so intense that an ordinary person would simply *react*, without reflection." (*Beltran*, *supra*, 56 Cal.4th at p. 949.)  "[T]he anger or other passion must be so strong that the defendant's reaction bypassed his thought process to such an extent that judgment could not and did not intervene." (*Ibid*.)  The examples provided by the prosecution do not misstate the law regarding provocation and heat of passion.

Castaneda asserts the prosecutor misstated the law by suggesting the jury consider Castaneda's actions, rather than his state of mind, when evaluating whether he was provoked into killing Vasquez, in the following ways:  (1) stating that Castaneda "was legally provoked only if the alleged provocation in this case would 'have caused the *same reaction* in an average person' "; (2) asking the jury "to consider whether the provocation in this case would 'justify killing someone' "; and (3) asking the jury "whether the

---

**⁶** Trial counsel only objected after the prosecutor proffered several examples of provocation and then told the jury "the situation that [] might apply is a partner walking into the room and seeing their loved one in the thro[e]s of passion with someone else and grabbing a weapon that's readily available right then.  Not killing the person who slept with your wife two years later."

provocation in this case would have caused a reasonable person 'to execute [Vasquez] on the road.' "

The first statement does not misstate the law of provocation, which focuses on "whether the average person would *react* in a certain way: with his reason and judgment obscured."[7] (*Beltran*, *supra*, 56 Cal.4th at p. 949.) Nevertheless, we agree with Castaneda that the prosecutor's statements that conflated Castaneda's reaction with his action did not correctly describe the law. "The proper focus is placed on the defendant's state of mind, not on his particular act." (*Ibid.*; see also *People v. Forrest* (2017) 7 Cal.App.5th 1074, 1085 (*Forrest*) [finding incorrect a prosecutor's argument that provocation may "reduce a murder to manslaughter only if 'a reasonable person would have done' what appellant did"].)

In any event, the prosecutor's complained-of arguments were not extensive when considered against the entire closing argument. In multiple instances during her argument, the prosecutor correctly stated the law by focusing on Castaneda's state of mind, including repeating CALCRIM No. 570 nearly verbatim.

When a "prosecutor intersperse[s] correct statements of the law with [] incorrect ones" (*Najera*, *supra*, 138 Cal.App.4th at p. 224), they may "create confusion." (*Ibid.*) In assessing whether the statements here created prejudicial error, we observe that the trial court gave the jury the proper instruction and, on rebuttal, the prosecution showed the jury the "exact jury instruction." In addition, the trial court instructed the jury to "follow the law as [the court] explain[ed] it to you, even if you disagree with it. If you believe that the attorneys' comments on the law conflict with [the court's] instructions, you must follow [the court's] instructions."

" 'When argument runs counter to instructions given a jury, we will ordinarily conclude that the jury followed the latter and disregarded the former' " (*Centeno*, *supra*,

_____

[7] Indeed, Castaneda's trial counsel did not object to this statement at trial.

15

60 Cal.4th at p. 676), because "[a]rguments of counsel generally carry less weight with a jury than do instructions from the court. The former are usually billed in advance to the jury as matters of argument, not evidence, [citation], and are likely viewed as the statements of advocates; the latter, we have often recognized, are viewed as definitive and binding statements of the law." (*Boyde*, *supra*, 494 U.S. at p. 384.) Thus, "[i]t is not likely that the jury applied the prosecutor's misstatements in an objectionable fashion." (*People v. Banks* (2023) 97 Cal.App.5th 376, 387; see also *Perez*, *supra*, 18 Cal.App.5th at pp. 624–625 [concluding there was no prosecutorial misconduct where jurors "were properly instructed on the prosecution's burden of proof, the elements of the offense[s], and, most importantly, that the instructions prevailed over any contradictory comments by the attorneys"].) We do "not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." (*Donnelly v. DeChristoforo* (1974) 416 U.S. 637, 647.)

In addition, we consider " 'whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which [Castaneda] complains affected the result.' " (*Beltran*, *supra*, 56 Cal.4th at p. 956.) Here, the case against Castaneda was strong and the evidence of provocation was weak.

Castaneda learned of D.B.P.'s affair with Vasquez and G.D.C.'s parentage approximately two to three years before the shooting. Not long thereafter, D.B.P. divorced Castaneda and he began a relationship with a woman in Mexico. Castaneda intended to move to Mexico with his sons and not with G.D.C., D.B.P., or their other daughter. Witnesses in the courtroom during the custody hearing testified that Castaneda was calm, and Castaneda himself described having calmed down after the courtroom bailiff intervened to disrupt his and Vasquez's confrontation in the hallway.

16

Sufficient time had elapsed between the provoking events and the killing of Vasquez for the heat of passion to subside. In addition, witnesses to the collision and shooting described Castaneda causing the collision, shooting an unarmed Vasquez, and pursuing Vasquez to continue shooting him, indicating no provocation in the moment. Castaneda admitted at trial that he blamed Vasquez for ruining Castaneda and D.B.P.'s marriage, and that he shot and killed Vasquez, including shooting Vasquez even after Vasquez started to run away.

In light of the strong evidence in the record supporting Castaneda's murder conviction and the comparatively weak evidence of provocation by Vasquez, the trial court's instructions to the jury, and the limited number of times the prosecutor misstated the law regarding provocation compared to the number of times it correctly stated the law, we conclude that there is no reasonable probability the jury would have reached a more favorable result absent the prosecutor's actions. Further, we perceive no significant unfairness that amounts to a denial of a fair trial. (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1345; see also *Forrest*, *supra*, 7 Cal.App.5th at p. 1085 [concluding "the prosecutor's fleeting misstatements of the legal standard regarding provocation were not so egregious as to amount to a denial of due process"].)

We therefore decide the prosecutor's misstatements do not constitute reversible error.

### III.  DISPOSITION

The judgment is affirmed.

_____

Danner, Acting P. J.

WE CONCUR:



_____

Wilson, J.




_____

Bromberg, J.




**H050460**

***People v. Castaneda***