Filed 1/28/21  P. v. Watson CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>ELIJAH LARON WATSON,<br><br>        Defendant and Appellant. | A156944<br><br>(San Francisco City & County<br>Super. Ct. No. 230041) |

A jury convicted defendant Elijah Laron Watson of misdemeanor domestic violence, simple battery, and resisting arrest.[1]  On appeal, he contends: (1) the trial court erred in allowing a police officer to testify to statements made by the victim because the statements are assertedly inadmissible hearsay and also testimonial under *Crawford*[2]; (2) his conviction for simple battery was unauthorized in light of his conviction for domestic violence, pursuant to *Williamson*[3]; and (3) the trial court erred in imposing

---

[1]  He had been charged with felony domestic violence (Pen. Code, § 273.5, subd. (f)(1); count 1), felony assault (Pen. Code, § 245, subd. (a)(4); count 2), felony false imprisonment (Pen. Code, § 236; count 3), and misdemeanor resisting an officer (Pen. Code, § 148, subd. (a)(1); count 4).

[2]  *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*).

[3]  *In re Williamson* (1954) 43 Cal.2d 651 (*Williamson*).

fines and fees without an ability to pay hearing, pursuant to *Dueñas*.[4]  We reverse the conviction for simple battery, but in all other respects, affirm.

**DISCUSSION[5]**

***Admission of Victim's Out-of-Court Statements***

**Section 402 Hearing**

Before trial, the prosecution sought a ruling under Evidence Code section 1240—the hearsay exception for "spontaneous statements"—allowing the introduction of statements by the victim made at the scene of the crimes to Officer Johnson.

Defendant objected, asserting the victim's statements did not qualify as spontaneous statements and they also were "testimonial" in nature under *Crawford*.  Counsel asserted the statements did not "fall[] squarely under 1240," because when the officer interviewed the victim, the defendant "was . . . across the street . . . surrounded by at least two officers at all times, if not three or four."  Thus, according to counsel, there was no longer "an ongoing emergency still and the danger had subsided."  The victim, in turn, was "sitting in the ambulance, and I don't think that the statement was taken from [her] until after the paramedics had spoken to her.  [¶] In the [body cam] video she's not tearful.  She's calm when she answers the paramedics questions, and I would argue that it's a violation of *Crawford*."

The prosecutor responded, "the victim had not met with paramedics yet.  And the way the report is written, the officer arrives; the defendant is immediately pointed out.  There's an attempt to detain the defendant. [¶] The defendant is combative . . . he's detained, then Officer Johnson gets a

---

[4] *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*).

[5] We discuss the relevant facts and procedural history in connection with the issues raised on appeal.

2

statement from [the victim], and as a result of that statement a request of paramedics arrive to treat her. . . .  [A]pproximately 20-something minutes from the time that the 911 call comes in until the statement by [the victim] to [the officer] is taken.  [¶] So during that time, you have a combative defendant. . . .  So you have officers who are attempting to control essentially a chaotic scene with multiple different people and attempting to just ascertain . . . what happened."

At this point, the court was "satisfied that any statement [the victim] made on Broadway within, you know, 40 minutes of the attack . . .  qualifies under 1240."

However, with respect to *Crawford*, the court requested an offer of proof as to exactly what statements the prosecutor sought to have admitted and when those statements occurred.  The court observed "this isn't some mystery shooter that we need to figure out what's going on.  They've identified the person who is the focus of the 911 call, and he's handcuffed across the street.  So at that point, I think the emergency part of this is sort of over," so depending on when the statements occurred the court would "view it differently."

At the continued hearing, the prosecutor had a "better handle on the timeline" and made the following proffer:  On arriving at the scene, someone "pointed out" defendant to Officer Johnson.  She exited her vehicle, and detained defendant.  She then went to the victim and took "a brief medical assessment"—"that is when the statement from [the victim] is taken," approximately 17 minutes after arriving at the scene in response to the 911 call and before the arrival of the ambulance and paramedics.

Defense counsel responded that even under this timeline of events, the victim's statement was testimonial because there was "no ongoing

3

emergency," as the defendant had "already been detained on the ground." There was no claim he had a weapon and he "was handcuffed with at least two officers standing by his side."

The court then pointed out that "when you [defense counsel] say there's no weapon and only one person was hurt, that's what we know now. . . . [¶] But your opponent's [(the prosecutor's)] argument is that those initial questions of what happened so you can figure out is there a weapon, is there someone else involved, what is the situation that we have here."

Defense counsel replied that during the 911 call there had been no mention of a weapon and reference to only one assailant, so "when the police officers were dispatched there, I would argue that they already knew who they were looking for . . . and that there was no weapon at least for officer safety."

The prosecutor urged that "The initial detention . . . is just to try to secure the scene. That doesn't tell them what happened. . . . That's why those statements are not testimonial in nature. There's no indicia of formality to them. They're made directly at the moment, directly at the time of the incident, and for the purpose of ascertaining what happened and securing the safety of the individuals involved."

Observing it was "a very close" case, the trial court concluded that based on the offer of proof—that the victim's statements occurred prior to the arrival of the ambulance—the statements were not testimonial. "I think that although with hindsight we can look back on it and say, this was a no-weapons situation with one actor who turns out to be Mr. Watson, allegedly, in the first few minutes all of that needs to be learned and confirmed. 9-1-1 calls . . . often contain erroneous information. It could have been that the wrong man had been detained across the street that they should keep looking

4

for someone else.  Asking what happened at that point. . . .  [¶] The fact that these statements weren't even memorialized," also weighed in the prosecution's favor.

### *Officer Johnson's Trial Testimony*

Around 6:30 a.m. on September 30, 2018, Officer Johnson received a dispatch to an after-hours club in San Francisco.  The call was "for service regarding a male and female in a physical" and was listed as a "A priority domestic violence."

Upon arrival at the scene, the victim approached her, told her defendant had "just attacked her," and pointed him out.  Officer Johnson noticed the victim's "hair is kind of messed up.  Her makeup, her lipstick was kind of smeared, and I noticed she had scratches on her neck."  Two other women also approached Johnson, pointed at defendant and stated, "he just attacked her."

Johnson then approached defendant, who "appeared extremely agitated" and angry.  Defendant yelled that he "better not go to jail" and repeatedly refused Johnson's request that he sit down.  He continued "pacing back and forth" and "clenching his fist."  When defendant turned his back to Johnson, she thought he might leave the scene.  So she used a leg-sweeping technique, and defendant "went straight down kind of on his butt" and "was yelling and screaming."  At that point, another police unit arrived, and the officers decided to put defendant in handcuffs.

After handcuffing defendant, Johnson walked back over to the victim— approximately 20 minutes after she had arrived on the scene.  The victim looked "like she had been crying.  She was very upset just like kind of frazzled a little bit.  But very upset."  The victim's "eyes were pretty red" and her makeup "was kind of smeared."  The victim identified defendant "as her

5

boyfriend" of about 14 months. She stated she and defendant were in her car driving to the club when they began having an argument. The victim parked, and defendant and the victim exited the vehicle and started walking toward the club. Defendant told the victim he had forgot something in the car, and she told him "just to leave it." Defendant "got upset, and started shouting, I'm going to embarrass you, just you watch, I'm going to embarrass you." The victim kept walking across the street toward her acquaintances when she felt defendant "grab her from behind." She fell to the ground, and defendant "grabbed her by her hair."

The victim did not give Johnson "specifics of what happened, but she said [defendant] struck her a few times. She wasn't able to tell . . . if it was with a fist or a slap. She said she remembered being struck to the face." The victim told Johnson defendant "at one point kind of choked her," and that "people had to help get him off of her." The victim also said she did not know if defendant had been drinking and stated that in the past defendant had been verbally abusive but there had been no physical abuse.

Johnson called for an ambulance and then photographed the victim's injuries and clothes, including a laceration on her knee and forearm. After paramedics arrived, Johnson "started interviewing the other witnesses."[6]

### *The Victim's Statements Were Admissible*

"In light of our hearsay rules and *Crawford*, a court addressing admissibility of out-of-court statements must engage in a two-step analysis. The first step is a traditional hearsay inquiry: Is the statement one made out

---

[6] Three days after the incident, in an interview, the victim told a different officer she did not want to press charges because defendant "did not do anything." When asked if defendant pushed her, grabbed her neck or scratched her neck, she said, " 'No.' " She claimed she " 'just fell down' " and "nobody was around her at all."

of court; is it offered to prove the truth of the facts it asserts; and does it fall under a hearsay exception? If a hearsay statement is being offered by the prosecution in a criminal case, and the *Crawford* limitations of unavailability, as well as cross-examination or forfeiture, are not satisfied, a second analytical step is required. Admission of such a statement violates the right to confront if the statement is *testimonial hearsay*, as the high court defines that term." (*People v. Sanchez* (2016) 63 Cal.4th 665, 680 (*Sanchez*).)

### *Spontaneous Statement*

"To come within the spontaneous statement exception to the hearsay rule, an utterance must first purport to describe or explain an act or condition perceived by the declarant. (Evid. Code, § 1240, subd. (a).) Secondly, the statement must be made spontaneously, while the declarant is under the stress of excitement caused by the perception. (*Id.*, subd. (b.)" (*People v. Farmer* (1989) 47 Cal.3d 888, 901 (*Farmer*), disapproved on other grounds in *People v. Waidla* (2000) 22 Cal.4th 690, 724, fn. 6.) In other words, "[f]or admission of a spontaneous statement ' "(1) there must be some occurrence startling enough to produce this nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must have been before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance; and (3) the utterance must relate to the circumstance of the occurrence preceding it." ' " (*People v. Clark* (2011) 52 Cal.4th 856, 925.)

"The crucial element in determining whether a declaration is sufficiently reliable to be admissible under this exception to the hearsay rule is . . . not the nature of the statement but the mental state of the speaker. The nature of the utterance—how long it was made after the startling incident and whether the speaker blurted it out, for example—may be

7

important, but solely as an indicator of the mental state of the declarant. The fact that a statement is made in response to questioning is one factor suggesting the answer may be the product of deliberation, but it does not ipso facto deprive the statement of spontaneity.  Thus, an answer to a simple inquiry has been held to be spontaneous.  [Citations.]  More detailed questioning, in contrast, is likely to deprive the response of the requisite spontaneity.  [Citations.]  But ultimately each fact pattern must be considered on its own merits. . . ."  (*Farmer*, *supra*, 47 Cal.3d at pp. 903–904.) " 'Neither lapse of time between the event and the declarations nor the fact that the declarations were elicited by questioning deprives the statements of spontaneity *if it nevertheless appears that they were made under the stress of excitement and while the reflective powers were still in abeyance.*'  [Citation.] [¶] Under the same reasoning, the fact that the declarant has become calm enough to speak coherently also is not inconsistent with spontaneity." (*People v. Poggi* (1988) 45 Cal.3d 306, 319 (*Poggi*).)

"Whether an out-of-court statement meets the statutory requirements for admission as a spontaneous statement is generally a question of fact for the trial court, the determination of which involves an exercise of the court's discretion.  [Citation.]  We will uphold the trial court's determination of facts when they are supported by substantial evidence and review for abuse of discretion its decision to admit evidence under the spontaneous statement exception." (*People v. Merriman* (2014) 60 Cal.4th 1, 65.)

Defendant maintains the "evidence here is insufficient under either the first or the second requirements for admissibility."  He asserts "hearsay statements qualifying under this exception generally concern horrifying events such as nearly dying at gunpoint, actually being shot, or being targeted by a violent drug gang," but here the "physical altercation with [the

8

victim's] boyfriend—in which both [the victim and defendant] received minor injuries and in which . . . both parties participated—did not rise to this level." He further claims there was no longer an ongoing emergency, as police had detained and handcuffed defendant and the victim was "only 'frazzled a little bit,' and certainly not startled, shocked or terrified." In fact, in his opening brief, defendant asserts the victim "gave her statement to police, from the safety of an ambulance." However, as the prosecution's offer of proof clarified and the trial court found, the victim's statements were given before the ambulance and paramedics arrived. And while defendant acknowledges "a lapse of time between [a] startling occurrence and [the] hearsay statement is not dispositive," he contends "[g]enerally . . . spontaneous statements are made within minutes of their triggering events," but here, "significant time . . . passed between the incident and [the victim's statement]."

However, defendant's characterization of the victim's demeanor does not fully capture the description provided by Officer Johnson. Officer Johnson described the victim as "very upset just like kind of frazzled a little bit. But very upset," and "like she had been crying," her "eyes were pretty red," and her "makeup was kind of smeared." And while defendant states the victim "was able to coherently provide background details such as how long she had been dating" defendant, Officer Johnson testified the victim did not give her "specifics about what happened" that night and the victim "wasn't able to tell" if defendant struck her "with a fist or a slap."

Thus, the *entirety* of the circumstances amply supports the trial court's ruling that the victim's statement qualifies as a spontaneous statement and thus was admissible under Evidence Code section 1240. (See *Poggi, supra*, 45 Cal.3d at p. 319 [victim's medical state would support a finding she was in a sufficiently traumatic condition so as to render her statements

9

spontaneously made " '*while [her] reflective powers were still in abeyance*' " from the violent assault and battery].)

Defendant's reliance on cases in which declarants were subject to "nearly dying at gunpoint, actually being shot" or dying after encountering a "violent drug gang," is unavailing, as these are not the only circumstances in which the spontaneous statement exception applies. (See, e.g., *People v. Saracoglu* (2007) 152 Cal.App.4th 1584, 1587-1588 (*Saracoglu*) [statement by victim to police officer admissible where victim came to police station and said she had been assaulted by the defendant 30 minutes earlier by choking her from behind, pushing her and hitting her]; Simons, Cal. Evidence Manual (2020 ed.) § 2:46, p. 142 ["Reliability depends primarily on the mental state of the speaker, not the nature of the statement."].) Likewise, his reliance on cases where the time that elapsed between incident and statement was less than that which occurred here is not conclusive. Here, less than 20 minutes elapsed between the 911 call and victim's statement to the responding officer. Indeed, "[m]uch longer periods of time have been found not to preclude application of the spontaneous utterance hearsay exception. (See *People v. Brown* (2003) 31 Cal.4th 518, 541 . . . [two and one-half hours]; *People v. Raley* (1992) 2 Cal.4th 870, 893–894 . . . [18 hours][7]; *In re Emilye A.* (1992) 9 Cal.App.4th 1695, 1713 . . . [one to two days.)" (*Sarcoglu, supra,* 152 Cal.App.4th at p. 1589.)

We thus conclude the trial court did not abuse its discretion in ruling the victim's statement was admissible as a spontaneous statement.

### *Not Testimonial*

---

[7] Superseded by statute on other grounds as stated in *People v. Brooks* (2013) 3 Cal.5th 1, 63, footnote 8.

We independently review whether an otherwise admissible out-of-court statement is testimonial such that its admissions violates the constitutional right to confrontation. (*People v. Nelson* (2010) 190 Cal.App.4th 1453, 1466 (*Nelson*).)

"*Crawford* held the confrontation clause 'prohibits "admission of *testimonial* statements of . . . witness[es] who did not appear at trial unless [the witness] was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." (*Crawford*, [*supra*, 541 U.S.] at pp. 53-54, italics added.)' [Citation.] Thereafter, . . . . in *Davis v. Washington* (2006) 547 U.S. 813 . . . [(*Davis*)], the high court explained that ' "[s]tatements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." ' [Citation.] After *Crawford*, the high court has emphasized that ' "not all those questioned by the police are witnesses" for purposes of the Sixth Amendment and not all " 'interrogations by law enforcement officers' [citation], are subject to the Confrontation Clause." [(*Michigan v.*] *Bryant* [(2011) 562] U.S. 344, 355 . . . [(*Bryant*)], quoting *Crawford, supra*, 541 U.S. at p. 53.).]' " (*People v. Chism* (2014) 58 Cal.4th 1266, 1288–1289 (*Chism*), fn. omitted, quoting *People v. Blacksher* (2011) 52 Cal.4th 769, 811 (*Blacksher*).)

Testimonial hearsay statements "are out-of-court analogs, in purpose and form, of the testimony given by witnesses at trial. . . . [T]hough a statement need not be sworn under oath to be testimonial, it must have

11

occurred under circumstances that imparted, to some degree, the formality and solemnity characteristic of testimony. . . . [T]he statement must have been given and taken primarily for the purpose ascribed to testimony—to establish or prove some past fact for possible use in a criminal trial." (*People v. Cage* (2007) 40 Cal.4th 965, 984 (*Cage*), italics & fn. omitted.)

In *Davis*, the United States Supreme Court explained that a statement is nontestimonial "when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." (*Davis, supra*, 547 U.S. at p. 822.) A statement is testimonial "when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Ibid.*, fn. omitted.)

In the first of two companion cases in *Davis* (case No. 05-5224), statements made by a domestic violence victim to a 911 operator identifying the defendant Davis as her assailant, and describing what he was doing during the call, were determined to be nontestimonial. (*Davis, supra*, 547 U.S. at pp. 817-818, 828-829.) In the companion domestic violence case, *Hammon v. Indiana* (case No. 05-5705) (*Hammon*) the high court found that there was no ongoing emergency where the victim appeared calm when encountered by police on the front porch of her home, but when questioned outside the defendant's presence said that he had thrown her down on broken glass and punched her in the chest. The court held these statements were made for the purpose of investigating a past crime, rather than to assist police in intervening in an emergency, and thus were barred by the confrontation clause. (*Davis,* at pp. 819-821, 829-830.)

12

In *Blacksher,* our Supreme Court "identified six factors to consider in determining whether statements made in the course of police questioning were for the ' "primary purpose of creating an out-of-court substitute for trial testimony" that implicates the confrontation clause.' (*Blacksher, supra,* 52 Cal.4th at p. 813.) These are (1) an objective evaluation of the circumstances of the encounter and the statements and actions of the individuals involved in the encounter; (2) whether the statements were made during an ongoing emergency or under circumstances that reasonably appear to present an emergency, or were obtained for purposes other than for use by the prosecution at trial; (3) whether any actual or perceived emergency presented an ongoing threat to first responders or the public; (4) the declarant's medical condition; (5) whether the focus of the interrogation had shifted from addressing an ongoing emergency to obtaining evidence for trial; and (6) the informality of the statement and the circumstances under which it was obtained. (*Id.* at pp. 814–815.)" (*Chism, supra,* 58 Cal.4th at p. 1289.)

Defendant maintains the victim's statement to Officer Johnson was testimonial because there was no ongoing emergency, as defendant "the sole suspect, had been identified, handcuffed, determined to be weaponless and detained." (Boldface omitted.)

Concededly, as the United States Supreme Court explained in *Bryant, supra,* 562 U.S. 344: "[T]he existence of an 'ongoing emergency' at the time of an encounter between an individual and the police is among the most important circumstances informing the 'primary purpose' of an interrogation. [Citations.] The existence of an ongoing emergency is relevant to determining the primary purpose of the interrogation because an emergency focuses the participants on something other than 'prov[ing] past events potentially relevant to later criminal prosecution.' [Citation.] Rather, it

13

focuses them on 'end[ing] a threatening situation.' [Citation.] Implicit in *Davis* is the idea that because the prospect of fabrication in statements given for the primary purpose of resolving that emergency is presumably significantly diminished, the Confrontation Clause does not require such statements to be subject to the crucible of cross-examination. [¶] This logic is not unlike that justifying the excited utterance exception in hearsay law. Statements 'relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition,' [citations], are considered reliable because the declarant, in the excitement, presumably cannot form a falsehood. [Citations.] An ongoing emergency has a similar effect of focusing an individual's attention on responding to the emergency." (*Bryant,* at pp. 361–362, fns. omitted.)

However, the *Bryant* court went on to state that "the existence *vel non* of an ongoing emergency" is not "dispositive of the testimonial inquiry" and explicitly instructs courts to take into account all "relevant circumstances" including "the victim's medical state," "the importance of *informality* in [the] encounter," and "a combined inquiry" of the statements and actions of both the interrogating officer and the victim. (*Id.* at pp. 364, 366-367, 369.) And as our own Supreme Court has enumerated, other factors are also important in determining whether a challenged statement is testimonial. (*Chism,* *supra*, 58 Cal.4th at p. 1289.) The ultimate question in any case is whether a statement made in the course of police questioning was for the ' "primary purpose of creating an out-of-court substitute for trial testimony.' " (*Blacksher, supra*, 52 Cal.4th at p. 813.)

In urging that the trial court errored, defendant relies principally on *Cage, supra,* 40 Cal.4th 965, wherein our high court concluded a victim's response to an officer's question in a hospital waiting room was testimonial

14

because the officer's "clear purpose in coming to speak with [the victim] at this juncture was not to deal with a *present emergency*, but to obtain a fresh account of *past events involving defendant* as part of any inquiry into possible criminal activity." (*Id.* at p. 985.) According to defendant, the victim's statements to Officer Johnson are akin to the victim's statement determined to be testimonial in *Cage*.

To begin with we do not agree that the "emergency" situation was entirely over when Officer Johnson, having just handcuffed defendant to ensure he did not leave the scene or injure anyone else, walked over to the victim. No medical personnel had yet arrived, so the victim's condition had not yet been assessed. Accordingly, it was entirely reasonable to conclude the officer's principal objective in speaking with the victim was to get an immediate handle on the situation, including the victim's condition, and not to create an out-of-court substitute for trial testimony.

Defendant's focus on the fact "[d]ispatch reported no weapon" and only "one" perpetrator does not dictate a different conclusion. While it is true only one perpetrator and no weapon were mentioned in the 911 call and in the dispatch, it does not follow that these were the actual facts and Officer Johnson had no call to assess the situation at the scene and determine whether, in fact, defendant was the lone perpetrator and there were no weapons at the scene. The fact that the victim's responses "also served to benefit the police in their investigation of the case does not alone render the victim's statement[s] testimonial. The test under *Crawford* is whether the *primary purpose* of the interrogation is to establish facts to be used against the perpetrator. The mere fact that the question might also be expected to ultimately yield evidence against the accused at trial does not transform nontestimonial circumstances into evidence-gathering questioning." (*Nelson*,

15

*supra,* 190 Cal.App.4th at p. 1467; see *Blacksher, supra*, 52 Cal.4th at p. 814 ["Even if hindsight reveals that an emergency did not, in fact, exist, if it reasonably appeared to exist based on the information known when the statement was made the emergency test is satisfied."].)

Furthermore, other relevant factors—including an objective evaluation of the circumstances of the encounter and the statements and actions of the individuals involved in the encounter, the declarant's medical condition, whether the officer's questioning had shifted to obtaining evidence for trial, and the informality of the statement and the circumstances under which it was obtained (*Chism*, *supra*, 58 Cal.4th at p. 1289)—indicate the victim's statements to Officer Johnson had neither the quality of a testimonial statement (see *Bryant*, *supra*, 562 U.S. at p. 377 [officer's questions lacked "any formality that would have alerted [the victim] to or focused him on the possibility of future prosecutorial use of his statements"]) nor were they procured with the objective of securing a substitute for trial testimony (see also *Cage, supra,* 40 Cal.4th at p. 984 ["statement must have been given and taken primarily for the purpose ascribed to testimony—to establish or prove some past fact for possible use in a criminal trial," italics omitted]).

Thus, the situation that occurred here was quite unlike that in *Cage*. In *Cage*, an officer was dispatched to the defendant's home on "report of a family fight." Upon arrival, the officer noticed a bloody towel and drops of blood and found the defendant "picking up broken glass" and with "two small cuts on her left hand." (*Cage, supra*, 40 Cal.4th at p. 971.) However, after speaking to the defendant, the defendant's mother, and her daughter, the officer "departed, having no reason to think a crime had been committed." (*Ibid*.) An hour later, the officer was dispatched to an intersection, where he found the defendant's son "sitting on the curb" with a "large cut on the left

16

side" of his face. Emergency medical personnel were already at the scene. (*Ibid.*) The officer went to the hospital, " 'at a later point,' " and spoke with the victim who was still waiting to be seen in the emergency room. (*Ibid.*) The officer asked what happened, and the victim said the defendant had pushed him, making him fall into a coffee table, whereupon the glass top broke, and before he could get up the defendant "picked up a piece of glass and cut him." (*Id.* at pp. 971-972.)

Our Supreme Court concluded the victim's statements to the officer were testimonial. The court explained that when the officer first encountered the victim, medical personnel "were already attending to [him]," and the officer "did not assist" in obtaining an ambulance for the victim, but rather "came to the hospital at a later time." (*Cage, supra*, 40 Cal.4th at p. 985.) "[B]y the time [the officer] spoke with [the victim] in the hospital, the incident that caused [the victim's] injury had been over for more than an hour. The alleged assailant and the alleged victim were geographically separated, [the victim] had left the scene of the injury, and he thereafter had been taken to a remote location to receive medical treatment. Though he apparently had not yet been treated by a doctor when [the officer] questioned him, he was in no danger of further violence as to which contemporaneous police intervention might be required." (*Ibid.*) Thus, the officer's "clear purpose in coming to speak with [the victim] at this juncture was not to deal with a *present emergency*, but to obtain a fresh account of *past events involving* [*the*] *defendant* as part of an inquiry into possible criminal activity. (*Ibid.*)

As we have recited, the circumstances here stand in contrast to those in *Cage.* Moreover, as *Cage* states, the overarching inquiry is whether a declarant's statement, "made with some formality" and "*viewed objectively*,

17

are for the *primary purpose* of establishing or proving facts for possible use in a criminal trial." (*Cage, supra*, 40 Cal.4th at p. 984, fn. 14.) This cannot be said of the victim's statements made to Officer Johnson. We therefore conclude the trial court did not err in ruling the victim's statements to Officer Johnson were not testimonial under *Crawford*.

### *Harmless Error*

In any event, even if the trial court did error in allowing the victim's statements to Officer Johnson, such error was harmless under either *People v. Watson* (1956) 46 Cal.2d 818, 836 or *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*).

There was overwhelming evidence defendant committed the offenses, including eyewitness testimony by multiple witnesses. A.S. saw defendant "grab[] [the victim] by the neck" and "hold[] [the victim] by the neck and [defendant] started punching her." Both A.S. and J.B. saw defendant attack the victim twice, each time taking her "down to the ground." The doorman stated he had to grab defendant by the wrist to get him to let go of the victim, and when he first saw defendant and the victim, defendant's "arm was kind of around her throat."

Defendant claims admission of the victim's statement was "highly prejudicial . . . [because] it was the only version portraying [defendant] as the sole aggressor" and that her statement "tipped the scales in favor of prosecution." However, as soon as Officer Johnson got to the scene, the victim and two other women approached Officer Johnson and told her defendant "just attacked her." The jury also heard J.B.'s 911 call in which she told the dispatcher, defendant had "just assaulted a girl. . . . [¶] [H]e basically begin to fight and then, um, he punched her. He's coming back to our [inaudible]. We're trying to protect her, but he keeps coming back."

18

Furthermore, a jury does not determine guilt by adding up the number of witnesses for and against each side.  On the contrary, juries are instructed, as the jury was here, that "If you determine that there is a conflict in the evidence, you must decide what evidence, if any, to believe.  Do not simply count the number of witnesses who agree or disagree on a point and accept the testimony of the greater number of witnesses.  On the other hand, do not disregard the testimony of any witness without a reason or because of prejudice or a desire to favor one side or the other.  What is important is whether the testimony or any other evidence convinces you, not just the number of witnesses who testify about a certain point." (*People v. Forrest* (2017) 7 Cal.App.5th 1074, 1083 [Jurors are presumed to have followed the court's instructions.].)

In sum, defendant has not, and cannot, establish that any error in allowing the victim's statements was prejudicial even under the *Chapman* standard.

### *Unauthorized Sentence*

Citing *Williamson, supra*, 43 Cal.2d 651, defendant contends that because the jury convicted him of misdemeanor domestic violence under a special statute (Pen. Code, § 243, subd. (e)(1)), his conviction for simple battery under the more general statute (Pen. Code, § 242) was unauthorized and must therefore be reversed.  "Under the *Williamson* rule, if a general statute includes the same conduct as a special statute, the court infers that the Legislature intended that conduct to be prosecuted exclusively under the special statute." (*People v. Murphy* (2011) 52 Cal.4th 81, 86.)

The Attorney General does not take issue with the substance of defendant's assertion, but maintains he forfeited the issue by failing to raise *Williamson* in the trial court.   However, because defendant's convictions for

19

both misdemeanor domestic violence and simple battery resulted in an unauthorized sentence, and because the question presents a pure question of law, we may consider it despite defendant's failure to object or move to dismiss below. (*People v. Harper* (2020) 44 Cal.App.5th 172, 185, fn. 12 [addressing the defendant's argument under *Williamson* despite lack of objection or motion to dismiss relevant count below]; *People v. Henry* (2018) 28 Cal.App.5th 786, 791, fn. 3 [same].)

Having rejected the Attorney General's forfeiture claim, we conclude, as the Attorney General concedes, that the *Williamson* rule applies here and precludes defendant's conviction of both misdemeanor domestic violence (Pen. Code, § 243, subd. (e)(1)) and simple battery (Pen. Code, § 242). We therefore shall reverse his conviction on count 2. Because the sentence on this count was stayed under Penal Code section 654, reversal of this conviction does not affect defendant's sentence.

### *Ability to Pay Hearing*

At sentencing, the trial court imposed a $500 domestic violence fund fee (Pen. Code, § 1203.097), a $150 restitution fine per conviction (Pen. Code, § 1202.4, subd. (b)(1)), a $40 court operations assessment per conviction (Pen. Code, § 1465.8), and a $30 critical needs assessment per conviction (Gov. Code, § 70373, subd. (a)). Citing *Dueñas, supra*, 30 Cal.App.5th 1157, defendant contends he was entitled to an ability to pay hearing prior to imposition of these fines and fees.[8]

In *Dueñas*, the defendant was a chronically-ill, unemployed homeless woman with cerebral palsy and limited education who supported her two

---

[8] The Supreme Court has recently granted review to address the issues raised in *Dueñas*. (*People v. Kopp* (2019) 38 Cal.App.5th 47, review granted Nov. 13, 2019, S257844.)

children through public aid.  (*Dueñas, supra*, 30 Cal.App.5th at pp. 1160–1161.)  She lost her driver's license because of her inability to pay her juvenile citations and then acquired three misdemeanor convictions for driving without a license because the accumulating fines and fees prevented her from clearing the citations and recovering her license.  (*Id.* at p. 1161.)  She experienced a series of "cascading consequences" because of "a series of criminal proceedings driven by, and contributing to, [her] poverty," and she had already been ordered to pay charges by the end of her probation period.  (*Id.* at pp. 1163–1164.)  The appellate court held "the assessment provisions of Government section 70373 and Penal Code section 1465.8, if imposed without a determination that the defendant is able to pay, are thus fundamentally unfair [and] imposing these assessments upon indigent defendants without a determination that they have the present ability to pay violates due process. . . ."  (*Dueñas, supra*, 30 Cal.App.5th at p. 1168.)  The court ordered the trial court to stay execution of the restitution fine "unless and until the People prove that [the defendant] has the present ability to pay it."  (*Id.* at pp. 1172–1173.)

The Attorney General asserts defendant forfeited his claim that the trial court was required to hold an ability to pay hearing since he failed to raise the issue below.  The Courts of Appeal have reached differing conclusions on the issue of forfeiture.  However, we need not weigh in on the issue, generally, as the instant case differs from *Dueñas* in several significant respects.

First, defendant had an express statutory right to request that the trial court determine his ability to pay to *the domestic violence fund fee*—a right that existed before *Dueñas* and a right defendant failed to exercise.  (Pen. Code, § 1203.097, subd. (a)(5)(A) [calling for a "minimum" $500 payment by

the defendant, and stating, "If, after a hearing in open court, the court finds that the defendant does not have the ability to pay, the court may reduce or waive the fee. If the court exercises its discretion to reduce or waive the fee, it shall state the reason on the record."].) Given this circumstance, we conclude defendant forfeited any complaint the trial court failed to hold an ability to pay hearing prior to ordering fines and fees. (See *People v. Gutierrez* (2019) 35 Cal.App.5th 1027, 1033 ["even if *Dueñas* was unforeseeable (a point on which we offer no opinion)," the defendant forfeited the issue where he "had the statutory right to request that the court consider his ability to pay in setting the restitution fine" but failed to do so].)

Second, the facts of *Dueñas* are readily distinguishable. Here, defendant was 37 years old at the time of the incident, he had received his GED, he had been employed full time as a "disc jockey/manager" and "earned $15 per hour" from January 2017 through September 2018; indeed, defendant testified he had been working earlier in the night before the incident occurred. Additionally, he was "slated to begin full-time employment as a monitor with a homeless shelter" in March 2019. Thus, it can readily be inferred from the record that defendant, unlike the defendant in *Dueñas*, either presently had, or would have, the ability to pay the fines and fees. Accordingly, any supposed due process violation under *Dueñas* was harmless beyond a reasonable doubt. (See *People v. Johnson* (2019) 35 Cal.App.5th 134, 139-140 [distinguishing *Dueñas,* and based on the record before it, holding any error harmless under *Chapman*].)

## DISPOSITION

Defendant's simple battery conviction (Pen. Code, § 242; count 2) is REVERSED, and the trial court is directed to amend the abstract of judgment accordingly. In all other respects, the judgment is AFFIRMED.

22

_____

Banke, J.

We concur:


_____

Margulies, Acting P.J.


_____

Sanchez, J.

A156944, People v. Watson