Filed 2/2/22  P. v. Castillo CA3
Opinion following rehearing

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C091329 |
| Plaintiff and Respondent, | (Super. Ct. No. 17FE001870) |
| v. | OPINION ON REHEARING |
| LUIS ALFONSO CASTILLO, JR., | |
| Defendant and Appellant. | |

Defendant Luis Alfonso Castillo, Jr., and his codefendant brother Emilio Angelo Castillo were involved in a shootout in front of the Capitol Casino in Sacramento.  A bullet fired by defendant struck and killed Nicholas Broadway, a casino patron who was outside waiting for a ride home when the shooting started.  Defendant was convicted by jury of second degree murder and possession of a firearm by a convicted felon.  The jury also found that defendant intentionally and personally discharged a firearm causing death.  After declining to strike defendant's firearm enhancement in the interest of justice, the

1

trial court sentenced him to serve an aggregate indeterminate prison term of 40 years to life plus a consecutive determinate term of three years.

On appeal, defendant contends: (1) the trial court prejudicially erred by providing an inadequate response to a jury question regarding what would happen if the jury could not unanimously agree that the prosecution had proved defendant was not acting in imperfect self-defense; (2) the prosecutor engaged in prejudicial prosecutorial misconduct during the closing and rebuttal arguments by misstating the law and arguing defendant's bad character; and (3) the trial court prejudicially abused its discretion by declining to dismiss the firearm enhancement in the interest of justice.

We filed an opinion affirming the judgment on November 12, 2021. Thereafter, defendant filed a petition for rehearing arguing two statutory enactments signed by the Governor on October 8, 2021, Senate Bill No. 567 (2021-2022 Reg. Sess.; hereafter Senate Bill 567) and Assembly Bill No. 124 (2021-2022 Reg. Sess.; hereafter Assembly Bill 124), would become effective before this appeal became final, and that both new laws must be applied retroactively to defendant's case under *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*).[1] We granted rehearing, vacated our initial opinion, and ordered supplemental briefing from the parties. Having reviewed their submissions, we accept their agreement that these enactments apply retroactively to this case and require remand for resentencing. In all other respects, we affirm the judgment. As we shall explain, defendant's complaint about the trial court's response to the jury's question is forfeited by his trial counsel's acquiescence in that response. The prosecutor's closing and rebuttal arguments did transgress the bounds of proper argument, but these missteps do not

---

[1] Defendant's petition for rehearing also asserted our initial opinion omitted a material fact when reciting the underlying facts of this case. While we do not consider the omitted fact particularly material, we nevertheless add it to our recitation of facts below.

2

require reversal.  Finally, the trial court did not abuse its discretion in declining to dismiss defendant's firearm enhancement in the interest of justice.

FACTS

On November 5, 2016, defendant and his brothers, Emilio and Armando, celebrated their cousin's birthday at their grandmother's house.  That night, they went to a nightclub with the cousin, her boyfriend, and several others.  Emilio's girlfriend, Alejandra Bravo, joined them at the club.  Around 1:00 a.m., they decided to leave the club and get some food at Capitol Casino.

The casino's surveillance camera shows defendant and Armando arriving first with their cousin's boyfriend, followed shortly thereafter by the cousin, and then Emilio and Bravo.  Defendant was wearing a black T-shirt with black pants and black shoes with black soles.  Armando was wearing a beige, red, and black check pattern button-up shirt over a black T-shirt with black pants and black shoes with white soles.  Emilio was also wearing a black T-shirt, black pants, and black shoes with white soles.  He was carrying a gray backpack that contained two handguns.

Upon their arrival, they went into the bar area.  The two couples sat at the bar and ordered food.  Defendant and Armando went back outside, where they exchanged words with another group of young men in the parking lot.  A fist fight broke out about a minute later.  Defendant was knocked down during the fight and the other young men went through his pockets while he was on the ground, apparently taking some of his belongings.  Armando then ran back into the casino and yelled to Emilio:  "Come out." Emilio could not hear what was said, but understood there was a problem.  He got up and followed his brother outside with the backpack.

Officer Michael Smith of the Sacramento Police Department was stationed in the casino lobby when Armando ran inside to get his brother.  He immediately got up and went out into the parking lot, following Armando and Emilio out the door.  Two security

3

guards followed, as did Bravo, the cousin and her boyfriend, and various other casino patrons.

Surveillance video shows the group of young men who were involved in the fight with defendant and Armando heading away from the casino entrance while defendant and his brothers came out with the officer and security guards. As Emilio explained during his trial testimony, the other group was standing behind a black sport-utility vehicle (SUV) when they got outside. An exchange of words resumed between the groups, causing Officer Smith to position himself between them, standing behind a white pickup truck that was parked between the SUV and the casino entrance. One of the security guards described the scene as "really chaotic." He approached defendant's group and told them they had to leave.

Defendant's group walked towards 16th Street, the main street providing access to the casino. The other security guard followed the group in order to escort them off of the property. There was a lot of arguing and yelling, both between the groups and within defendant's group, the latter consisting of aggressive "let's do this" and "let's get them" from male voices in the group, intermingled with "don't do this" and "let's just leave" from female voices in the group.

Defendant was "a little hyped up" as they walked towards 16th Street and grabbed Emilio's backpack. Officer Smith described, "I could see them struggling over the backpack" and "trying to get into [it]." Concerned that the backpack might contain a weapon, the officer yelled for the security guard nearest 16th Street to "get back." He did so.

Emilio testified that he lost possession of the backpack during the struggle, after which defendant handed him one of the firearms that was inside, a Glock semiautomatic handgun. Based on all of the evidence, defendant retained possession of the other firearm, a .40-caliber Smith and Wesson semiautomatic handgun, and used it to initiate the shootout that followed.

4

Officer Smith testified that he saw a Hispanic male with tattoos on his arms pull a handgun out of the backpack and fire two rounds in his direction.[2] Based on the muzzle flash, he could tell the shots were not directed at him, but rather about 30 feet to his side, apparently at the other group of young men near the black SUV. The officer returned fire, getting off five rounds before taking cover behind the white truck as multiple additional rounds were fired in his direction. These rounds struck both the truck and the SUV as the officer crouched behind the truck's rear passenger side tire.

From the surveillance video, it appears that the victim, Nicholas Broadway, was struck by one of the first rounds fired. Broadway was simply trying to leave the casino. A casino employee used her Uber app to order him a ride and accompanied him into the parking lot to try to find the vehicle sent to pick him up. That vehicle was parked on 16th Street. As Broadway followed the employee out towards his ride, the employee saw a young man wearing black pants and a black shirt pull out a handgun and open fire as a young woman was pulling on his other arm, "trying to drag him away and pull him away to just leave." Broadway ran towards the casino entrance and can be seen on the surveillance video diving behind a parked car near the entrance as Officer Smith returned fire.

The security guards also ran towards the casino entrance when the shooting started and crouched behind parked cars. When Broadway got to them, they could see he was bleeding and laid him down on the ground while they put pressure on his wound. As they did so, additional shots were fired from a car traveling down a side street towards 16th Street.

---

[2]     Prior to trial, the officer identified Emilio as the person he believed fired these rounds. The officer was "pretty sure." However, both defendant and Emilio appear to have tattoos on their arms in the surveillance video. They were also dressed nearly identically.

Broadway was hit by a bullet fired by a .40-caliber Smith and Wesson semiautomatic handgun. He died from his injuries.

After the shootout, defendant's group walked fairly casually around the casino along 16th Street, crossed a side street, and continued though an adjacent parking lot, picking up the pace through the parking lot as Emilio ran to a dumpster and threw his Glock handgun inside. The group then backtracked towards the casino, as multiple police vehicles arrived, before heading their separate ways for the night.

The Glock handgun Emilio threw in the dumpster was recovered during the investigation that followed. Thirteen shell casings fired by this weapon were found at the scene near 16th Street. Seven shell casings fired by a .40-caliber Smith and Wesson handgun were also found interspersed with these casings near 16th Street. As mentioned, the bullet that killed Broadway was fired by this type of weapon. While it was never recovered, defendant's ex-girlfriend testified that she bought a .40-caliber Smith and Wesson handgun about a year prior to the shooting. She bought the gun with defendant while living with him. About a month before the shooting, she and defendant broke up. She moved out without taking the gun with her.

Ten additional shell casings were also found at the scene. Five were fired by Officer Smith's Sig Sauer service pistol. The other five were fired by a fourth weapon, apparently associated with the other group of young men, and possibly fired from the car the security guard saw driving down the side street as he tried to prevent Broadway from bleeding to death.

Defendant and Emilio were eventually arrested for their involvement in the shooting.

DISCUSSION

# I

## *Response to the Jury's Question*

Defendant contends the trial court prejudicially erred by providing an inadequate response to a jury question. The contention is forfeited.

## A.

## *Additional Background*

Defendant and Emilio were tried together. They were each charged with Broadway's murder and the attempted murder of Officer Smith. Defendant was additionally charged with possession of a firearm by a convicted felon. Various firearm enhancement allegations were attached to the murder and attempted murder counts. The jury was fully and accurately instructed on the law applicable to these crimes and enhancements. Defendant does not argue otherwise.

During their deliberations, the jury sent the following question to the trial court: "Please clarify outcome if jury is not unanimous in deciding guilty of the lowest level crime. For example, page 38, last paragraph says, If the People have not met this burden, you must find the defendant not guilty of murder. Jurors are confused as to this meaning, A, hung jury, or B, defendant must be not guilty."

The trial court conferred with the parties regarding how best to respond. The trial court began the discussion: "If you go to 38, that's the instruction on imperfect self-defense. And like all the self-defense instructions, it will say, in the last paragraph, if the People haven't met their burden of proving the defendant didn't do something, then you must find him not guilty. This is in the context, though, of reducing a murder to a voluntary manslaughter because of the not-negated presence of imperfect defense, I guess would probably be the best way to say it. [¶] So in the question, they first say if the -- in quoting, If the People have not met their burden, you must find the defendant not guilty of murder, then it says, The jurors are confused as to this meaning, hung jury or

7

defendant must be not guilty, period.  [¶]  You know, I've always learned to don't over-read these things.  I mean, kind of read them for the least -- you know, so my question is that -- but it's purely a guess -- that you have somebody that looks at a murder might be reduced to a manslaughter or voluntary manslaughter if the People haven't negated imperfect self-defense, and if -- read that, somebody saying, well, that must mean he's not guilty, not just of murder, but not guilty period, versus you've got a hung jury."

The trial court asked for comments.  Defendant's trial counsel stated that if the People had not negated imperfect self-defense, defendant and Emilio would be "not guilty of murder and they would be guilty of voluntary manslaughter."  The trial court interjected:  "Well, they -- they could say not guilty of that too but --"  Defendant's attorney agreed.  The trial court continued:  "But the absence of imperfect self-defense doesn't compel that, that's all."

The prosecutor suggested referring the jury back to CALCRIM No. 640, providing detailed instructions for filling out the verdict forms.  The prosecutor also suggested "it might be a case where you would ask the jury if they would want to hear further argument of five minutes each on that issue."

Emilio's trial counsel then provided a "slightly different" interpretation of the jury's note, the details of which need not be recounted here.

The trial court proposed responding to the jury's note by directing the jury to CALCRIM No. 3550, regarding their duty to deliberate and try to agree on a verdict if possible, CALCRIM No. 640, set forth in greater detail below, and pointing out that the portion of CALCRIM No. 571 quoted in the jury's question specifically deals with the issue of whether a defendant is guilty of the greater crime of murder as opposed to voluntary manslaughter.

Defendant's trial counsel responded:  "My sense is that I think the Court's approach is a good one.  I don't have any objection to what the Court is posing and to try

8

that.  We're not giving them any new information, but we're clarifying and directing them."

Further discussion between the trial court, the prosecutor, and Emilio's trial counsel followed, with the latter objecting to any instruction because he feared "sending them down a rabbit hole" without knowing exactly "what their confusion is."  The trial court proposed adding a line to the end of the response asking the jury to advise the court if the response did not address their concern.  Defendant's counsel added:  "I think it's a cautious sort of step-by-step approach."

The trial court ultimately responded to the jury's question with the following:

"As set forth in instruction 3550, it is your duty to talk with one another and to deliberate in the jury room.  You should try to agree on a verdict if you can.  Each of you must decide the case for yourself, but only after you have discussed the evidence with the other jurors.  Do not hesitate to change your mind if you become convinced that you are wrong.  But do not change your mind just because other jurors disagree with you.

"Instruction 640A sets forth a range of determinations that you may make with respect to the crime charged in Count One and the relevant lesser included offenses.  These potential determinations include findings that a defendant is guilty, not guilty, or that you cannot come to a unanimous agreement with respect to a crime or lesser included offense.  Please review that instruction to determine if it is responsive to your question.

"In further response to your question regarding instruction number 571 on page 38 of the instructions, please note that this instruction pertains only to circumstances under which Imperfect Self-Defense may reduce Murder to Voluntary Manslaughter.

"Please review the foregoing to determine if you have a remaining question on this topic."

The jury did not ask any further questions regarding this issue.

9

## B.

### *Forfeiture*

"When the trial court responds to a question from a deliberating jury with a generally correct and pertinent statement of the law, a party who believes the court's response should be modified or clarified must make a contemporaneous request to that effect; failure to object to the trial court's wording or to request clarification results in forfeiture of the claim on appeal." (*People v. Dykes* (2009) 46 Cal.4th 731, 802.)

Defendant acknowledges his trial counsel did not object to the trial court's response to the jury's question, but argues the issue is nevertheless preserved for review because Penal Code[3] section 1259 permits us to "review any instruction given, . . . even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby."  Defendant also argues Emilio's trial counsel's objection to the trial court's response adequately "preserved the issue on this record." We are not persuaded.

The jury asked the trial court to clarify what the outcome would be if the jury could not unanimously agree that defendant was guilty of voluntary manslaughter and expressed confusion about the last paragraph of CALCRIM No. 571.  That paragraph states:  "The People have the burden of proving beyond a reasonable doubt that the defendant was not acting in [imperfect self-defense].  If the People have not met this burden, you must find the defendant not guilty of murder."  (CALCRIM No. 571.)  The jury asked whether the failure to unanimously agree that the People proved defendant was not acting in imperfect self-defense would result in a "hung jury" or a verdict of "not guilty."

---

[3]    Undesignated statutory references are to the Penal Code.

10

Because the jury expressed the possibility of being unable to reach a unanimous verdict, the trial court referred the jury to CALCRIM No. 3550 and emphasized their duty to try to reach a unanimous verdict. The trial court also referred the jury to CALCRIM No. 640 regarding the "range of determinations" that could be made with respect to the murder count and its lesser included offenses. As delivered to the jury, this instruction provides in relevant part:

"1. If all of you agree that the People have proved beyond a reasonable doubt that a defendant is **GUILTY** of first degree murder, complete and sign that verdict form. Do not complete or sign any other verdict forms for Count One.

"2. If all of you cannot agree whether a defendant is guilty of first degree murder, inform me that you cannot reach an agreement and do not complete or sign any verdict forms for Count One.

"3. If all of you agree that a defendant is **NOT GUILTY** of first degree murder but also agree that a defendant is **GUILTY** of second degree murder, complete and sign the form for **NOT GUILTY** of first degree murder and the form for **GUILTY** of second degree murder. Do not complete or sign any other verdict forms for Count One.

"4. If all of you agree that a defendant is **NOT GUILTY** of first degree murder but cannot agree whether a defendant is guilty of second degree murder, complete and sign the form for **NOT GUILTY** of first degree murder and inform me that you cannot reach further agreement. Do not complete or sign any other verdict forms for Count One.

"5. If all of you agree that a defendant is **NOT GUILTY** of first degree murder and **NOT GUILTY** of second degree murder, but also agree that a defendant is **GUILTY** of voluntary manslaughter, complete and sign the forms for **NOT GUILTY** of first degree murder and **NOT GUILTY** of second degree murder and the form for **GUILTY** of voluntary manslaughter. Do not complete or sign any other verdict forms for Count One.

11

"6.     If all of you agree that a defendant is **NOT GUILTY** of first degree murder and **NOT GUILTY** of second degree murder, but cannot agree whether a defendant is guilty of voluntary manslaughter, complete and sign the forms for **NOT GUILTY** of first degree murder and **NOT GUILTY** of second degree murder and inform me that you cannot reach further agreement.  Do not complete or sign any other verdict forms for Count One.

"7.     If all of you agree that a defendant is **NOT GUILTY** of first degree murder, **NOT GUILTY** of second degree murder, and **NOT GUILTY** of voluntary manslaughter, complete and sign the verdict forms for **NOT GUILTY** of each crime.  Do not complete or sign any other verdict forms for Count One."

Read together, this response would have informed the jurors that they were required to try to reach a unanimous verdict, if possible.  In order to reach a unanimous verdict of guilty, each juror had to agree that the People proved guilt beyond a reasonable doubt.  If they so agreed with respect to first degree murder, they were to sign that verdict form.  If they unanimously agreed the People had not carried the burden of proving first degree murder beyond a reasonable doubt, they were to sign the verdict form for not guilty.  If they could not unanimously agree on the matter, they were to sign nothing and inform the trial court of their impasse.  Similarly, with respect to second degree murder, if after finding defendant not guilty of first degree murder, they unanimously agreed the People proved beyond a reasonable doubt that he was guilty of second degree murder, they were to also sign that verdict form.  If, however, they unanimously agreed the People had also not carried this burden, they were to sign the verdict form for not guilty.  Again, if they could not unanimously agree on the matter, they were to sign no other verdict forms and inform the trial court of their failure to agree as to second degree murder.  Only if the jury unanimously agreed that defendant was not guilty of both first and second degree murder would they be signing a voluntary manslaughter verdict form.  And again, if they unanimously agreed the People proved his guilt beyond a reasonable

12

doubt, they would sign that verdict form.  If they unanimously agreed the People had not carried this burden, they would sign the not guilty verdict form.  And if they could not unanimously agree, they would sign no further verdict forms and inform the trial court.

Finally, the trial court also informed the jury that CALCRIM No. 571 pertained only to reducing murder to voluntary manslaughter.  This instruction begins:  "A killing that would otherwise be murder is reduced to voluntary manslaughter if . . . ." (CALCRIM No. 571.)  The instruction then goes on to define the circumstances of imperfect self-defense that operate to reduce a murder to involuntary manslaughter and informs the jury that the People had the burden of proving beyond a reasonable doubt that those circumstances did not exist.

From all of this, the jury would have understood that it could return the verdict that it did, i.e., guilty of second degree murder, only if the jurors unanimously agreed the People had not carried the burden of proving first degree murder beyond a reasonable doubt, but that the People did carry this burden with respect to second degree murder, i.e., by proving the elements of murder beyond a reasonable doubt and also proving by the same standard that defendant was not acting in imperfect self-defense.

We conclude this information adequately responded to the jury's question.  If defendant wanted further clarification of the People's burden of proof on the murder charge, as he argues in his appellate briefing, "defense counsel should have requested . . . [such] clarification" from the trial court.  (*People v. Dykes*, *supra*, 46 Cal.4th at p. 803.) Failure to do so results in forfeiture of the issue on appeal.

## II

### *Prosecutorial Misconduct*

Defendant also claims the prosecutor engaged in prejudicial prosecutorial misconduct during the closing and rebuttal arguments by (1) misstating the law, and (2) arguing defendant's bad character.  We conclude there was prosecutorial error, but it was harmless.

13

## A.

### *General Legal Principles*

" 'A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury.' [Citation.] When a claim of misconduct is based on the prosecutor's comments before the jury, as all of defendant's claims are, ' "the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." ' [Citation.]" (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 305.)

"Advocates are given significant leeway in discussing the legal and factual merits of a case during argument. [Citation.] However, 'it is improper for the prosecutor to misstate the law . . . .' [Citations.]" (*People v. Centeno* (2014) 60 Cal.4th 659, 666.) Nor may a prosecutor urge "the jury [to] draw inferences concerning defendant's guilt from conclusions regarding defendant's general bad character." (*People v. Dykes*, *supra*, 46 Cal.4th at p. 774.) "To establish such error, bad faith on the prosecutor's part is not required. [Citation.] '[T]he term prosecutorial "misconduct" is somewhat of a misnomer to the extent that it suggests a prosecutor must act with a culpable state of mind. A more apt description of the transgression is prosecutorial error.' [Citation.]" (*Centeno*, at pp. 666-667.)

With these legal principles in mind, we turn to defendant's specific objections to the prosecutor's argument.

## B.

### *Misstatements of Law*

As defendant notes in his appellate briefing, his defense counsel argued that he, at most, "committed manslaughter, having been in fear for his life and/or provoked because of the violent attack."

Addressing this argument, the prosecutor stated during the rebuttal argument: "As far as manslaughter, I touched on it just briefly. Now, the defendant was actually provoked? You could say, yeah. I mean, you're knocked to the ground. That would be provocation. Intense emotion, you could argue that [defendant] would have it at that point. But does it -- is it an intense emotion that obscures his reasoning and judgment?" The prosecutor argued defendant was not "under the direct and immediate influence of the provocation" because of the separation of time between the initial fist fight in the parking lot and the shooting. After arguing that a reasonable person standard applied to the question of provocation, the prosecutor continued: "So a person of average disposition, are they going to run and grab the gun out, or are they going to go talk to that officer or security [guard] and point the people out? Or maybe run over and continue the fight once the brothers are with them? Is a person of average disposition going to take that gun out and then conceal it and walk out to the street?"

Defense counsel objected that the argument misstated the law. The trial court overruled the objection, stating: "I don't think it misstates the law necessarily. Each side has their interpretations. The jury's heard the evidence. They've got the instructions. [¶] Go ahead." The prosecutor continued: "[I]t talks about a person with an average disposition, are they going to act a certain way?"

As our Supreme Court explained in *People v. Beltran* (2013) 56 Cal.4th 935: "Heat of passion is a mental state that precludes the formation of malice and reduces an unlawful killing from murder to manslaughter. Heat of passion arises if, ' "at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an

15

extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment." ' [Citation.] Heat of passion, then, is a state of mind caused by legally sufficient provocation that causes a person to act, not out of rational thought but out of unconsidered reaction to the provocation. While some measure of thought is required to form either an intent to kill or a conscious disregard for human life, [i.e., express or implied malice,] a person who acts without reflection in response to adequate provocation does not act with malice." (*Id*. at p. 942, fn. omitted.) Thus, "[t]he proper focus is placed on the defendant's state of mind, not on his particular act. To be adequate, the provocation must be one that would cause an emotion so intense that an ordinary person would simply *react*, without reflection. . . . [P]rovocation is not evaluated by whether the average person would *act* in a certain way: to kill. Instead, the question is whether the average person would *react* in a certain way: with his reason and judgment obscured." (*Id*. at p. 949.)

Here, the prosecutor's rebuttal argument misstated the law by incorrectly informing the jury that provocation is sufficient to reduce a murder to manslaughter only if a person with an average disposition would have done what defendant did, i.e., grab a gun, walk out to the street, and use the gun to fire upon his adversaries. Similar remarks were made and rebuked in *People v. Forrest* (2017) 7 Cal.App.5th 1074. As in that case, "[a]lthough such remarks amount to a misstatement of the legal standard regarding provocation under *Beltran*, . . . we nevertheless find that the statements do not require reversal in this case." (*Id.* at p. 1085.)

Because we conclude in the following section that the prosecutor also erred in making improper reference to defendant's status as an ex-felon, we address prejudice cumulatively later in this opinion.

## C.

### *Arguing Defendant's Bad Character*

For purposes of proving the charge of possession of a firearm by a convicted felon, the parties stipulated to the fact that defendant was previously convicted of a felony. Defendant takes issue with the following comments made by the prosecutor during closing argument after referring to this stipulation.

The prosecutor began by urging the jury to "consider, in knowing that he was convicted of that felony, think about some of the circumstances that led him to possess that gun" and "the mindset of this person . . . as he goes through that night." The prosecutor continued: "And what's important to know is this is the person that is already, from the time [his ex-girlfriend is] getting that gun, circumventing the law. He doesn't care at this point. He's having this gun, she's purchasing it, but he has access to it. He takes it when she's gone, and on the night when they're just going out on the town to the bar, he thinks, the ex-felon, I'm going to bring a handgun with me. So keeping that mentality in mind of what kind of person, who's already been convicted of a felony, knows he cannot possess a gun, but decides to bring it out for a night on the town, whether or not he's going to be a rule-follower. Whether or not he's going to stop when someone disrespects him."

Defense counsel objected to this line of argument as "character evidence." The trial court allowed the prosecutor to continue, stating "I think we're talking about what reasonable inferences can be drawn from the evidence." The prosecutor continued: "It's clear that a reasonable inference for anybody that takes a gun in a backpack out to a bar is ready to use that gun."

Had the prosecutor simply argued that bringing a loaded gun to a bar supported a reasonable inference that defendant was ready and willing to use it, there would be no problem. But he did not so limit his argument. Instead, he asked the jury to consider defendant's "mindset" as an "ex-felon," and to keep in mind the "mentality" of that "kind

of person," suggesting that such a person would not "stop when someone disrespects him." As we stated long ago: "It is well settled that the guilt of a defendant on trial for an alleged crime cannot be established by proof of general bad character or of other crimes or wrongful acts which have no relevancy to the crime charged . . . ." (*People v. Adams* (1926) 76 Cal.App. 178, 184.) In accordance with this long-standing rule, the jury was instructed not to consider the fact that defendant was previously convicted of a felony for any purpose other than determining whether he was guilty of violating section 29800. And yet the prosecutor urged the jury to do just that. This was error. (See, e.g., *People v. Grant* (2003) 113 Cal.App.4th 579, 589-590 [prosecutor erred in urging jury to draw impermissible inference that defendant committed one crime based on evidence that he committed another crime].)

We now turn to the question of prejudice.

## D.

### *Prejudice*

We conclude the prosecutor's errors in misstating the law of provocation and improperly referring to defendant's status as an ex-felon did not render defendant's trial fundamentally unfair in violation of the Fourteenth Amendment to the federal Constitution. We therefore apply the state law standard for harmless error—i.e., whether, based on the totality of the evidence, it is reasonably probable a result more favorable to defendant would have occurred absent these prosecutorial errors. (*People v. Castillo* (2008) 168 Cal.App.4th 364, 386; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

The evidence supporting defendant's guilt was very strong. That defendant fired the fatal shot was not disputed. The contested issues at trial involved whether defendant fired in self-defense, perfect or imperfect, and whether his reason was obscured by such passion as would cause an ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection. The self-defense theory was undercut by evidence, set forth in greater detail above, that defendant was the first to open fire. The

18

heat of passion theory was undercut by the fact that the initial fistfight had ended by the time Armando ran inside the bar area to get Emilio and the two returned to the parking lot with the firearms in the backpack. Officer Smith and two security guards followed them out, the officer positioning himself between the groups of young men while the security guards attempted to get defendant's group to leave. The young women in defendant's group also tried to deescalate the situation and convince defendant and his brothers to leave. Instead, defendant struggled with Emilio over possession of the backpack, pulled out the .40-caliber handgun, handed Emilio the other Glock handgun, and opened fire. On these facts, the jury was more than justified in concluding defendant did not fire in self-defense and no reasonable person in defendant's position would have reacted with his reason and judgment obscured by the fistfight that was already over.

Moreover, the trial court properly instructed the jury on the provocation required to mitigate a murder to voluntary manslaughter on a heat of passion theory. The jury was also properly instructed not to consider defendant's prior felony conviction for any purpose other than proving he violated section 29800. "The court's instructions, not the prosecution's argument, are determinative, for '[w]e presume that jurors treat the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade.' [Citation.]" (*People v. Mayfield* (1993) 5 Cal.4th 142, 179.)

We conclude there is no reasonable probability that defendant would have received a more favorable outcome had the prosecutor not committed the errors set forth above.

### III

### *Denial of Defendant's Request to Dismiss the Firearm Enhancement*

We also reject defendant's assertion that the trial court prejudicially abused its discretion by declining to dismiss his firearm enhancement in the interest of justice.

19

Effective January 1, 2018, Senate Bill No. 620 (2017-2018 Reg. Sess.) amended section 12022.53 to provide: "The court may, in the interest of justice pursuant to Section 1385 and at the time of sentencing, strike or dismiss an enhancement otherwise required to be imposed by this section." (§ 12022.53, subd. (h); Stats. 2017, ch. 682. § 2.) Sentencing in this case occurred after this provision went into effect.

Defendant urged the trial court to exercise its discretion to strike his firearm enhancement, arguing: "In this matter, there are sufficient grounds for the court to strike the section 12022.53[, subdivision ](d) enhancement. The psych report filed under seal indicates problems with post-traumatic stress due to [defendant] witnessing a violent crime against a family member. It is believed that the incident negatively influenced his life and made him fearful, presenting a life challenge to [defendant] early in his life. [Defendant] has prospects for rehabilitation, including a close-knit family that will continue to provide emotional support to him during his incarceration. [Defendant] also has children who he is close to and who depend on him. Although [defendant] has a prior felony, he has no prior juvenile offenses, indicating that issues with criminality are not deeply rooted or influenced by his family. The probation report indicates that at the time of his arrest he was employed full-time and was paying child support. If the court strikes the firearm enhancement, [defendant] will still have an indeterminate 15 to life term to serve, and could one day be eligible for parole provided he demonstrates sufficient rehabilitation. Due to the foregoing, it is requested that the court consider exercising its authority to strike the enhancement."

After hearing oral argument on the matter, the trial court denied the request. The trial court explained that it was required to consider defendant's "background, character, and prospects" in determining whether to strike the enhancement in the interest of justice and indicated it had reviewed the probation report and the psychological report noted above. The trial court acknowledged defendant's family had attended and supported him throughout the trial. The trial court also noted defendant's prior felony conviction for

20

assault with a deadly weapon, as well as multiple prior misdemeanor convictions, including false imprisonment.  The trial court further noted the probation report indicated defendant had "attack[ed] another inmate . . . without provocation" while at the jail.  The trial court then noted defendant was 32 years old at the time of the current offense and provided a brief overview of the facts of this case, noting "a common element" shared by the current offense, defendant's jailhouse conduct, and two of his prior convictions, i.e., "violence against someone else."  The trial court then stated:  "The flip side of this, as you know, and it's entitled to some consideration is that [defendant] is a relatively young person and we like to think that anyone can change over time."  The trial court then noted the loss suffered by the victim and his family and concluded:  "The Court can't find that in the interest of justice that the enhancement should be stricken, so the Court's going to deny that motion."

" ' "[A] court's discretionary decision to dismiss or to strike a sentencing allegation under section 1385 is" reviewable for abuse of discretion.'  [Citation.]  'In reviewing for abuse of discretion, we are guided by two fundamental precepts.  First, " '[t]he burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary.  [Citation.]  In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review.' "  [Citation.]  Second, a " 'decision will not be reversed merely because reasonable people might disagree.  "An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge." ' "  [Citation.]  Taken together, these precepts establish that a trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it.'  [Citation.]"  (*People v. Pearson* (2019) 38 Cal.App.5th 112, 116.)

Defendant argues the trial court's decision declining to strike his firearm enhancement amounted to an abuse of discretion because "the fight precipitating the

21

shooting was a significant factor in mitigation of the current offense," his "prior convictions were sparse," only one of which involved violence, and other "particulars of [his] background, character and prospects" noted in the psychological report ("chronic posttraumatic stress disorder" and "extremely low" scores for "verbal comprehension and perceptual reasoning") also "supported the conclusion [defendant] should not have been subject to the additional penalty of the firearm enhancement." We are not persuaded. Even assuming all of these circumstances weighed in favor of striking the firearm enhancement, they do not, as defendant contends, so "manifestly support[] the striking of the firearm enhancement in this case [that] no reasonable minds could differ."

We conclude the trial court did not abuse its discretion in declining to strike defendant's firearm enhancement in this case.[4]

---

[4]    In the alternative, defendant suggests the trial court was unaware of its discretion to reduce the firearm enhancement, as opposed to simply striking it, and asks us to remand the matter to the trial court for an exercise of that discretion. In support of this argument, defendant points to *People v. Morrison* (2019) 34 Cal.App.5th 217, a recent decision from the First Appellate District, holding that a court exercising its discretion to strike an enhancement under section 1385 can instead opt to impose a lesser enhancement in the interest of justice. (*Morrison*, at p. 222.) Our Supreme Court recently held "*Morrison* correctly described the scope of a trial court's sentencing discretion under section 12022.53." (*People v. Tirado* (Jan. 20, 2022, S257658) ___ Cal.5th ___, ___ [2022 Cal. Lexis 149, *9].) However, we need not determine whether or not the trial court was aware of this aspect of its discretion when it declined to strike defendant's firearm enhancement. This is because we must remand for resentencing for a retroactive application of Senate Bill 567 and Assembly Bill 124, as we explain immediately below. During that resentencing, the trial court may reconsider all sentencing choices previously made. (*People v. Burbine* (2003) 106 Cal.App.4th 1250, 1258.) Thus, the trial court will be able to reconsider whether or not to strike defendant's section 12022.53, subdivision (d) enhancement at that time. Following *Tirado*, if the trial court decides to strike this enhancement, it may instead impose one of the lesser enhancements.

# IV

## *Retroactive Application of Senate Bill 567 and Assembly Bill 124*

In addition to an indeterminate term of 40 years to life for the murder and firearm enhancement, defendant was sentenced to a consecutive determinate sentence of three years for possession of a firearm by a convicted felon, the upper term for that crime. The upper term was selected "because the crime involved great violence, great bodily harm and the threat of great bodily harm." At the time of defendant's sentencing, section 1170, subdivision (b) provided the trial court with discretion to choose between the lower, middle, or upper term, after considering the record in the case, the probation report, other reports, statements in aggravation or mitigation, and any other evidence introduced at the sentencing hearing, based on which term, "in the court's discretion, best serves the interests of justice." (Former § 1170, subd. (b).) This changed, however, on January 1, 2022, when Senate Bill 567 and Assembly Bill 124 went into effect. (Stats. 2021, ch. 731, § 1.3 [Senate Bill 567]; Stats. 2021, ch. 695, § 5 [Assembly Bill 124].)

Senate Bill 567 "amends section 1170 and 1170.1 to establish a sentencing procedure consistent with the decisions of the United States Supreme Court in *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*), *Blakely v. Washington* (2004) 542 U.S. 296 (*Blakely*), and *Cunningham v. California* (2007) 549 U.S. 270 (*Cunningham*), when a trial court seeks to impose the upper term of custody." (Couzens, Selected Changes to California Sentencing Laws Effective 2022 (Barrister Press 2021) p. 6.)

Section 1170, subdivision (b) now provides in relevant part: "(1) When a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the court shall, in its sound discretion, order imposition of a sentence *not to exceed the middle term*, except as otherwise provided in paragraph (2). [¶] (2) The court may impose a sentence exceeding the middle term *only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by*

23

*the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial.* Except where evidence supporting an aggravating circumstance is admissible to prove or defend against the charged offense or enhancement at trial, or it is otherwise authorized by law, upon request of a defendant, trial on the circumstances in aggravation alleged in the indictment or information shall be bifurcated from the trial of charges and enhancements. The jury shall not be informed of the bifurcated allegations until there has been a conviction of a felony offense. [¶] (3) Notwithstanding paragraphs (1) and (2), the court may consider the defendant's prior convictions in determining sentencing based on a certified record of conviction without submitting the prior convictions to a jury. This paragraph does not apply to enhancements imposed on prior convictions." (Italics added.)

Assembly Bill 124 also amended section 1170, adding paragraph (6) to subdivision (b). This paragraph provides: "Notwithstanding paragraph (1), and unless the court finds that the aggravating circumstances outweigh the mitigating circumstances that imposition of the lower term would be contrary to the interests of justice, the court shall order imposition of the lower term if any of the following was a contributing factor in the commission of the offense: [¶] (A) The person has experienced psychological, physical, or childhood trauma, including, but not limited to, abuse, neglect, exploitation, or sexual violence. [¶] (B) The person is a youth, or was a youth as defined under subdivision (b) of Section 1016.7 at the time of the commission of the offense. [¶] (C) Prior to the instant offense, or at the time of the commission of the offense, the person is or was a victim of intimate partner violence or human trafficking." (§ 1170, subd. (b)(6).)

The Attorney General concedes these changes in the law are ameliorative and apply retroactively to defendant's case, requiring remand for resentencing. (See *Estrada*, *supra*, 63 Cal.2d 740.) We accept the concession and order the appropriate remand.

24

## DISPOSITION

Defendant's convictions and enhancement finding are affirmed.  The sentence imposed is vacated and the matter is remanded for resentencing.


/s/
HOCH, J.



We concur:



/s/
MAURO, Acting P. J.



/s/
KRAUSE, J.